## Case No. 16,264.

### UNITED STATES v. SHARP et al.

[Pet. C. C. 118.] [1]

Circuit Court, D. Pennsylvania.    April Term, 1815.

JOINT INDICTMENT—SEPARATE TRIALS—EVIDENCE OF SANITY — REVOLT OF SEAMEN — LOG AS EVIDENCE—SEAMEN PUT ON BOARD BY CONSUL—CONFINING MASTER.

1. When several persons are charged in one indictment, with the same offence, each defendant has a right to be tried separately.

[Cited in U. S. v. Bladen, Case No. 14,606; U. S. v. Watkins, Id. 16,649; U. S. v. White, Id. 16,682; U. S. v. Peterson, Id. 16,037.]

[Cited in Fife v. Com., 29 Pa. St. 438; Hawkins v. State, 9 Ala. 137. Cited in brief in State v. Kring, 64 Mo. 592.]

2. A journal kept by the master of a ship, who was alleged to be insane, was allowed to be read in evidence, to prove his sanity by the style in which it was kept; but not as evidence of any fact stated in it.

3. The log book kept by the master, is not evidence, in an indictment for a revolt, and confining the master.

4. A protest which was not offered to discredit the testimony of any one who had signed it, and had given testimony, is not evidence.

5. Seamen, put on board a vessel of the United States by a consul, are within the meaning of the act of congress, entitled "An act for the punishment of certain crimes against the United States" (2 Bior. & D. Laws, 93 [1 Stat. 112]); and they are bound by the same obligations which exist in cases of articled seamen.

6. What constitutes the offence of making, or attempting to make a revolt on board a ship.

[Cited in U. S. v. Hemmer, Case No. 15,345.]

7. Laws which create crimes, ought to be so explicit in themselves, or by reference to some

---

[1] [Reported by Richard Peters, Jr., Esq.]

known standard, as that all may know what they prohibit.

[Cited in U. S. v. New Bedford Bridge, Case No. 15,867; U. S. v. Brewer, 139 U. S. 288, 11 Sup. Ct. 541; Chicago & N. W. Ry. Co. v. Dey, 35 Fed. 876; Tozer v. U. S., 52 Fed. 920.]

8. Any confining of the master, whether by force or intimidation, is a confinement, within the meaning of the act of congress.

[Cited in U. S. v. Smith, Case No. 16,345.]

9. One who joins in the general conspiracy, and by his presence countenances acts of violence, but who does not individually use force or threats, to compel the master to resign the command of his vessel; is guilty of the offence of confining the master.

[Cited in U. S. v. Peterson, Case No. 16,037.]

10. A master of a vessel may so conduct himself, as to justify the officers and crew in placing restraints upon him, to prevent his committing acts, which might endanger the lives of all the persons on board; but an excuse of this kind must be listened to with great caution, and such measures should cease, the moment the occasion for them ceases.

This was an indictment [against Sharp, Steward, Anderson, Macky, Smith, Williams, and Johnson] for making a revolt, endeavouring to make a revolt, and for confining the master. The prisoners upon their arraignment, severally pleaded, not guilty. The counsel for the three first, moved that they might be tried by one jury, distinct from the other four; as their defence was not only different in some respects, but at variance with that of the other four. The difficulty of making their challenges, where some of the prisoners might approve of the men challenged by the others, was stated as a reason, why they had a right to claim separate trials. The court granted the motion.

In justification of the conduct of the prisoners, in confining the captain, and transferring the command to Sharp, the mate, they gave evidence, tending to prove mental derangement in the captain. To disprove this charge, the district attorney offered the journal kept by the master, (in which, the master swore he made the entries every night,) from the style of which, the jury would be able to judge of the state of the master's mind, during the period in which he was charged with insanity. This evidence was objected to, but THE COURT allowed the journal to be read, for the purpose for which it was offered; but not as evidence of any fact stated in it.

THE COURT overruled the motion of the district attorney, to read the log book kept by the mate. A protest made at Bordeaux, was also offered in evidence by the district attorney, and rejected by the court; as it was not to be used for the purpose of discrediting any one who had signed it, and who had given evidence in the cause.

The facts proved in the cause, and upon which the points of law arose, were, that the four prisoners then on trial, were distressed seamen, taken on board by Risborough, master of the letter of marque, the Vixen, at Bordeaux, upon the request of the American consul there; who paid ten dollars for each of them, being the sum to which the master was entitled, under the act of the 28th February, 1803 (3 Bior. & D. Laws, 527 [2 Stat. 203]); for transporting distressed seamen, from foreign ports to the United States, upon request of the consuls of the United States. That during the voyage, the crew getting dissatisfied with the master, compelled him by threats of personal injury, to confine himself to her cabin, and to resign the command of the vessel; which they, by vote, transferred to Sharp, the next officer on board, who assumed and retained it for more than a fortnight; when he left the Vixen, in order to conduct a prize into the United States; and the command was, by a plurality of votes of the crew, restored to Captain Risborough.

Upon these facts, it was contended by the counsel for the prisoners; that they were not such seamen, as are intended by the act of congress, constituting the offences with which the prisoners are charged (2 Bior. & D. Laws, 93, 94, §§ 8, 12 [1 Stat. 112]); as they are not seamen of the vessel, bound by any contract with the master, entitled to any compensation or owing him obedience.

Secondly. It was contended, that the word revolt, is not defined by any act of congress; nor is it defined by the common or civil law, nor by any judicial decision to be met with in any reporter, or in any elementary writer upon law. That if the philological meaning be sought for, it is so various, so diffusive, as to furnish no safe definition for a crime; particularly for one so highly penal, as this is made, by the act of congress. The statute of 11 & 12 Wm. III. c. 7, made it a capital offence to make, or endeavour to make a revolt, or to confine the master; but yet it does not appear, that from that time to this, any decision has been made, by which a definition of the word revolt, has been given. The case which comes the nearest to it, is to be found in East, Crown Law, 796. Both sides referred to Johnson's Dictionary, word "revolt." The French dictionaries and Barretti's Italian Dictionary, give the same word. They also referred to Shakespeare. The material facts in the case are stated in the charge.

C. J. Ingersoll, U. S. Dist. Atty.

Mr. Sergeant and J. R. Ingersoll, for defendants.

WASHINGTON, Circuit Justice. Before the case is examined upon the evidence, it will be proper to settle the points of law which have been discussed. It is contended for the prisoners: First. That they are not such seamen, as are contemplated by act of congress creating the offences, with which they are charged; because they were not seamen of, or belonging to the vessel, not having been engaged as such by the master, and not having entered into a contract, to entitle

them to wages, or the master to their services. The counsel was mistaken in supposing, that the 8th or 12th section of the law, speaks of seamen of, or belonging to the vessel, in reference to the offences charged in this indictment. That expression is used in one part of the 8th section, in relation to certain acts of piracy; but the clause which declares it to be piracy to make a revolt, and a misdemeanor to endeavor to make one, or to confine the master, speaks of seamen generally. But if the supposed expression had been used, it would have made no difference, in as much as the men received on board at Bordeaux by the master, upon the application of the American consul, were as much seamen of the vessel, and belonging to her, as those who had signed the shipping articles. By the 4th section of the act of congress, of the 28th February, 1803, the American consuls and vice consuls at foreign ports, are required to provide passages, for all destitute American seamen, within their districts, to some port of the United States; and to pay for the passage of each seaman, a sum, not exceeding ten dollars. The master of every American vessel is bound, upon the requisition of the consul, to receive such seamen, not exceeding two in number, for every ton of his vessel; and to transport them to the United States, under a penalty; and on the part of such seamen, they are bound, to do duty on board such vessel, according to their abilities. Here then is a contract created by the law. which, in consideration of support and transportation by the master, obliges the seaman to perform all the duties of one, and creates all the relative obligations and duties of master and servant, which exist in cases of articled seamen.

It is objected, that the offence of making a revolt, is not sufficiently defined by this law, or by any other standard, to which reference could be safely made; to warrant the court in passing a sentence upon the prisoners, in case of conviction.

I confess I have always considered, (although without having examined the matter with much attention,) to make a revolt, was to throw off all obedience to the master; to take possession by force of the vessel by the crew; to navigate her themselves, or to transfer the command to some other person on board. A revolution, going to such an extreme, appeared to me to bear a strict analogy to treason against the state; amounting to a falling off from the allegiance due from an inferior to a superior; and, which might be attended with consequences equally mischievous, to the owner, as preventing him from defending his vessel. I thought it applied as well to merchant vessels in time of peace, as in time of war; whereas the other clause was confined to hostile resistance, against a public enemy, or against a pirate. This was certainly the impression of the court, in the case of U. S. v. Smith [Case No. 16,318], upon an indictment for confining the

master, and endeavouring to make a revolt. But although this is still my opinion, yet I am not able to support it, by any authority to be met with, either in the common, admiralty, or civil law. If we resort to definitions given by philologists, they are so multifarious, and so different, that I cannot avoid feeling a natural repugnance, to selecting from this mass of definitions, one, which may fix a crime upon these men, and that too of a capital nature; when, by making a different selection, it would be no crime at all, or certainly not the crime intended by the legislature. Laws which create crimes, ought to be so explicit in themselves, or by reference to some other standard, that all men, subject to their penalties, may know what acts it is their duty to avoid. For these reasons, the court will not recommend to the jury, to find the prisoners guilty of making, or endeavouring to make a revolt, however strong the evidence may be. But there is an offence laid in this indictment, the definition of which is perfectly clear. That is, confining the master; which is declared to be a misdemeanor, by the 12th section of this law. In the same case, of U. S. v. Smith, this court laid it down; that any confinement of the master, whether by depriving him of the use of his limbs, or by shutting him up in the cabin, or by intimidation, preventing him from the free use of every part of the vessel; amounts to a confinement, in contemplation of law.

The next enquiry is, whether according to this definition. Captain Risborough, the commander of this vessel, was confined by his crew. The evidence upon this point is clear. It appears, that about four o'clock in the afternoon, of the 28th February last, nearly three weeks after the vessel had commenced her voyage, the weather being squally, the captain went forward to the forecastle, and called the men upon deck to assist in taking in the sails; some of them replied, that the watch was on deck, and upon the order being repeated, two of them, Parker and Dougherty, (or probably only the latter,) answered that they did not come on board to work. The captain said he would see to that, and immediately returning to the cabin, came again upon deck with a pistol in his hand, where he found those two men standing; he reproached them (as he says) for their disobedience, and according to the testimony of some of the witnesses for the prisoners, added some abusive language. The captain states, that Parker bared his breast, and told him to fire: other witnesses do not mention this fact, and rather exculpate this man from the charge of insolence. The captain struck Parker with the pistol, and then snapped it at him. They immediately cried out, and the captain swears that the cry was general, to throw him overboard. There is no doubt but that there was immediately a tumultuous assemblage of the crew aft, accompanied by such circumstances of menace, as to induce Captain Stafford, a passenger, and the only

friend Captain Risborough seems to have had on board, to advise him to retire to the cabin, as it was impossible for him to encounter the whole crew. He followed this advice, and was probably saved from the grasp of Smith, one of the prisoners who rushed after him, by the mate Mr. Sharp. It appears that after the captain had retired to the cabin, the tumult seemed to subside upon deck for a short time. About an hour afterwards, Captain Stafford overheard some of the crew, in the steerage, conversing upon the late occurrence, and declaring, that Captain Risborough was not fit to command the vessel; that they would throw him overboard, and give the command to Sharp. Upon communicating these threats to the captain, it was deemed necessary to provide immediately for his defence, and they accordingly loaded some of the muskets. In a short time after this, the crew again assembled, and cried out a sail. By some of the witnesses for the prisoners, it was stated that the cry was made only by the man at the helm. It was near dark, and one of the witnesses declares, that he thought he saw a sail, but it was a mistake. Captain Stafford, who was on deck at the time, believing that this was only a feint intended to draw the captain on deck, for the purpose of doing him some injury; went below and communicated this opinion to the captain. The captain, however, desirous of satisfying himself as to the fact, ascended the steps with caution, and had scarcely put his head above the companion way, when he was seized by one or more of the crew, and with great difficulty he was able to extricate himself from the hold they had taken of him. The tumult was now considerable, and Sharp being on deck, drew the slide over the companion, probably with a view to prevent the crew from descending into the cabin; there was then a general cry upon deck for an axe, to cut a hole in the trunk of the companion way, in order to get the captain out that way. One of the witnesses for the prisoners, has sworn that the axe was called for by Dougherty. Soon after this, the crew being generally assembled, a paper was presented to Mr. Sharp, signed by twenty-one of them, the purport of which, so far as we can ascertain it from the witnesses, was to require the captain to resign the command in favour of Sharp. Sharp declining to take the paper, it was delivered to Mr. Lloyd, the supercargo; who conveyed it to Captain Risborough. After consulting with Captain Stafford, they concluded that the captain's safety required his acquiescence; and he accordingly signified his assent to Mr. Lloyd, who communicated it to the crew. Risborough then sent for Sharp, and desired him to do his best to conduct the vessel to the first port in the United States. Every thing was now tranquil, and the captain went upon deck that night without further molestation.

The following night the crew again assembled aft, and sent to the cabin for Sharp, and soon after for Captain Stafford, to come to them. They said that the captain was mad, and they were afraid he might put fire to the magazine; they therefore desired, that a centinel might be placed over it, and that the muskets which had been loaded, should be discharged. Some of them proposed that the captain should be put in irons. At length it was determined to discharge the muskets and to guard the magazine by a centinel; which determinations were accordingly executed.

On the 2d of March an order was given by Mr. Sharp, to the centinel, not to permit Captain Risborough to come on deck at night, in consequence, as it is said, of a report made to him by Mr. Lloyd, that he had heard the captain say he would as leave throw himself overboard as not. This order was strictly executed until the 16th of March; when by a new election of the crew, Captain Risborough was restored to his command, in consequence of Sharp going on board of an English prize, in order to conduct her into port. About ten days prior to this capture, they had brought to a Portuguese vessel, and got from her some supplies; which on the part of the prosecution it is contended, were piratically taken, and on that of the prisoners, that they were freely gave. This transaction however forms no part of the question for the consideration of the jury. Upon this summary of the evidence, it cannot be denied; that Captain Risborough was compelled, by the threats and violent proceedings of his crew, to confine himself to his cabin, from about four o'clock of the afternoon of the 28th of February, until he consented to abdicate his command of the vessel, upon the requisition of his mutinous crew, and with a view to the preservation of his life. This state of confinement was removed for a day or two, and was then renewed and rigidly enforced, during the nights. The offence therefore, of confining the captain, by intimidation, is fully established, if the witnesses are believed by the jury.

Secondly. The remaining enquiry under this head is, whether the prisoners at the bar are implicated in the offence, proved against the crew generally. It is not necessary that they should be proved individually, to have used any force or threats to compel him to confine himself to his cabin or to resign his command. It is sufficient, if they joined in the general confederacy, and by their presence countenanced the acts of violence which produced these consequences. If a number of men associate themselves together, to commit a felony or trespass, and only one of them do the act in the presence of the others, all the confederates are guilty as principals. In this case it is proved, that the crew were all assembled, except a sick seaman and a degraded officer, at the different periods when the before mentioned acts of violence were committed and the prisoners are proved to

have been present at some of them. Had they not joined in the conspiracy, they ought, and certainly would have separated themselves from the mutineers. Had they done so, it is not improbable, but they might have prevented the perpetration of the offence, which is so clearly proved; by holding themselves up to the rioters, as persons who might at least be dangerous witnesses against them, when called to answer for their conduct. Independent of this evidence against the crew generally, it is proved that Smith, one of the prisoners, pursued Captain Risborough, when he was returning to the cabin, and was arrested by the mate; that Macky was one of the signers of the paper, requiring the captain to resign; and that the whole of the prisoners, at different times, actually kept guard in the cabin over the magazine.

Thirdly. The prisoners, however, have attempted to excuse themselves, by alleging the violence of the captain against two of their comrades, and his threat, made at the same time, to throw a barrel of gunpowder into the forecastle, and blow them up, if they refused to obey his orders; which it is proved he did; and lastly, upon the plea of the captain's insanity. It cannot be doubted, but that the master of a vessel, may so conduct himself, as to justify his officers and crew placing restraints upon him, to prevent the commission of acts, which might endanger the lives of the whole. It is true, the law does not provide for such an emergency, nor was it necessary; the law of our nature, which is paramount to all human laws, would justify such conduct in such a case. But an excuse of this kind, should be listened to with great caution. Precarious indeed would be the interests of commercial men, if the occasional violence of the master they have selected, or the suspicions of the crew, that from any cause he is unfit to command; should be a sufficient justification to them, for removing him from the station to which he was appointed, and substituting one of their own choice, to fill his place. If he attempts to commit unjustifiable acts of violence against an individual, or individuals of the crew, he may be resisted. Parker and Dougherty, when he approached them with a loaded pistol, would have been justified in any act, necessary for their preservation. Had he been really deranged; or had he given such evidence of an intention to commit the desperate act, of which he was suspected; a restraint, accommodated to the emergency, might have been lawfully applied. But as to the rash attempt to take the life of Parker, which cannot be held in too great abhorrence, the danger had passed away, before the offence was committed with which the prisoners are charged. Even Parker and Dougherty could not justify themselves, (and much less could the rest of the crew,) for their subsequent acts, in confining the captain, and depriving him of the command. A man may, in self defence, even take the life of his opponent; but if the danger is at an end, he cannot justify himself for afterwards committing any act of violence whatever against him. In like manner, the threat of Captain Risborough, to throw a barrel of gunpowder into the forecastle, if the crew refused to obey his orders, was rash and foolish, but it was obviously the threat, as the former was the act, of a man, under the temporary influence of passion; from which no danger could be reasonably apprehended, nor does it appear that any was apprehended in consequence of it.

It is next said, that the captain was mentally deranged, and that fears were entertained by the crew, that he would blow up the magazine. The question is not, what were the apprehensions of the crew; but is their evidence to satisfy the jury, and such as ought to have satisfied a reasonable and firm man, that such was the state of the captain's mind, and such the danger of his going at large? What are the circumstances relied upon, to prove him a madman, and a mischievous one? They are, his snapping a pistol at one of the crew; his threat in relation to the barrel of gunpowder; his asking the steward, on the 1st of March, which way his pistol pointed; and his expression to Lloyd, on the 2d of March, that he would think very little of jumping overboard. This conduct, and these declarations, as proofs of derangement, are entirely equivocal. In connection with other circumstances, they might prove that fact; or they might be the effect of an irritable temper, and a wounded sensibility, brooding over the degraded state to which a mutinous crew and a cold hearted set of officers, had reduced him. In his apprehension of personal danger, he might well talk incoherently, in relation to his means of defence; and in the despondency of his heart, he might look with a desperate indifference at a criminal act of suicide. But let it always be remembered, that this state of his mind, might be the consequence of his disgrace, and not the cause of it. No witness pretends to say, that he was at any time unsound in mind, until after the crime imputed to the crew, was committed; and shall the prisoners be allowed to excuse their crime, upon the plea of derangement in the captain, which their conduct had occasioned? Certainly not.

But let the sincerity of those who make this plea, be tested by their own conduct. In the first place, it should be observed, that when the witnesses for the prisoners were asked, why they thought the captain mad, scarcely any of them agreed in assigning the same reason; but Captain Stafford, his only friend on board, and who was constantly with him, declares, that he saw no symptom of derangement, and that he did not consider him so at any moment of time. That the crew, for whom this plea is made,

did so consider him, may well be suspected; from their sending to him a paper, requiring his acquiescence in the measures proposed, for deposing him from the command, and the appointment of a successor. It is the dictate of common sense, that a person of unsound mind, cannot bind himself or others by his consent; and they must have known, that a compulsory change in the government of the vessel, could not be legitimated, by the acquiescence of an insane commander. In the next place it appears, that Sharp, on some occasions occurring after his usurpation, consulted with Captain Risborough; which would have been very absurd, had he thought the captain insane. Another strong proof of the recollection and prudence of Captain Risborough, was his directing the supercargo, to read the consul's letter to the crew; with a view to prevent them from committing any act of hostility against the Portuguese vessel.

But, even suppose the transactions of the 28th, had so operated upon the mind of Captain Risborough, as to derange it; and that this, if made out, would excuse the act of confining him; still this violent measure of precaution, should not have extended a moment beyond the existence of the danger which occasioned it; and a continuation of the confinement, after the captain was restored to his senses, would, in the eye of the law, amount to the crime of confining the captain. Further, such conduct would afford strong evidence, that the excuse now set up was affected and not real; since, if the latter, upon the cause ceasing the effect would naturally cease. Now it is in evidence by the prisoners' witnesses, those who thought him insane; that they considered him to be of sound mind, some days before they overhauled the British vessel; upon which occasion, and in consequence of Sharp quitting the vessel to go on board the prize; the captain, instead of receiving back his authority as of right, was by a plurality of votes, elected master against Captain Stafford, who was set up as his competitor by some of the crew.

With these observations the case was left with the jury.

Verdict: Guilty of confining the captain, and not guilty as to the residue of the indictment.

Judgment was arrested, for the reasons on which the indictment was quashed upon the trial of the other prisoners, Sharp and others. See Case No. 16,265.