Justice SCALIAdelivered the opinion of the Court.
Under the Armed Career Criminal Act of 1984, a defendant convicted of being a felon in possession of a firearm faces more severe punishment if he has three or more previous convictions for a "violent felony," a term defined to include any felony that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B). We must decide whether this part of the definition of a violent felony survives the Constitution's prohibition of vague criminal laws.
I
Federal law forbids certain people-such as convicted felons, persons committed to mental institutions, and drug users-to ship, possess, and receive firearms. § 922(g). In general, the law punishes violation of this ban by up to 10 years' imprisonment. § 924(a)(2). But if the violator has three or more earlier convictions for a "serious drug offense" or a "violent felony," the Armed Career Criminal Act increases his prison term to a minimum of 15 years and a maximum of life. § 924(e)(1); Johnson v. United States,559 U.S. 133, 136, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010). The Act defines "violent felony" as follows:
"any crime punishable by imprisonment for a term exceeding one year ... that-
"(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
"(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious *2556 potential risk of physical injury to another." § 924(e)(2)(B)(emphasis added).
The closing words of this definition, italicized above, have come to be known as the Act's residual clause. Since 2007, this Court has decided four cases attempting to discern its meaning. We have held that the residual clause (1) covers Florida's offense of attempted burglary, James v. United States,550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007); (2) does notcover New Mexico's offense of driving under the influence, Begay v. United States,553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008); (3) does not cover Illinois' offense of failure to report to a penal institution, Chambers v. United States,555 U.S. 122, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009); and (4) does cover Indiana's offense of vehicular flight from a law-enforcement officer, Sykes v. United States,564 U.S. 1, 131 S.Ct. 2267, 180 L.Ed.2d 60 (2011). In both Jamesand Sykes, the Court rejected suggestions by dissenting Justices that the residual clause violates the Constitution's prohibition of vague criminal laws. Compare James, 550 U.S., at 210, n. 6, 127 S.Ct. 1586, with id.,at 230, 127 S.Ct. 1586(SCALIA, J., dissenting); compare Sykes, 564 U.S., at ----, 131 S.Ct., at 2276-2277, with id.,at ----, 131 S.Ct., at 2286-2288(SCALIA, J., dissenting).
This case involves the application of the residual clause to another crime, Minnesota's offense of unlawful possession of a short-barreled shotgun. Petitioner Samuel Johnson is a felon with a long criminal record. In 2010, the Federal Bureau of Investigation began to monitor him because of his involvement in a white-supremacist organization that the Bureau suspected was planning to commit acts of terrorism. During the investigation, Johnson disclosed to undercover agents that he had manufactured explosives and that he planned to attack "the Mexican consulate" in Minnesota, "progressive bookstores," and " 'liberals.' " Revised Presentence Investigation in No. 0:12CR00104-001 (D. Minn.), p. 15, ¶ 16. Johnson showed the agents his AK-47 rifle, several semiautomatic firearms, and over 1,000 rounds of ammunition.
After his eventual arrest, Johnson pleaded guilty to being a felon in possession of a firearm in violation of § 922(g). The Government requested an enhanced sentence under the Armed Career Criminal Act. It argued that three of Johnson's previous offenses-including unlawful possession of a short-barreled shotgun, see Minn.Stat. § 609.67(2006)-qualified as violent felonies. The District Court agreed and sentenced Johnson to a 15-year prison term under the Act. The Court of Appeals affirmed. 526 Fed.Appx. 708 (C.A.8 2013)(per curiam). We granted certiorari to decide whether Minnesota's offense of unlawful possession of a short-barreled shotgun ranks as a violent felony under the residual clause. 572 U.S. ----, 134 S.Ct. 1871, 188 L.Ed.2d 910 (2014). We later asked the parties to present reargument addressing the compatibility of the residual clause with the Constitution's prohibition of vague criminal laws. 574 U.S. ----, 135 S.Ct. 939, 190 L.Ed.2d 718 (2015).
II
The Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." Our cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.Kolender v. Lawson,461 U.S. 352, 357-358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). The prohibition of vagueness *2557 in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process." Connally v. General Constr. Co.,269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences. United States v. Batchelder,442 U.S. 114, 123, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).
In Taylor v. United States,495 U.S. 575, 600, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), this Court held that the Armed Career Criminal Act requires courts to use a framework known as the categorical approach when deciding whether an offense "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." Under the categorical approach, a court assesses whether a crime qualifies as a violent felony "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." Begay, supra,at 141, 128 S.Ct. 1581.
Deciding whether the residual clause covers a crime thus requires a court to picture the kind of conduct that the crime involves in "the ordinary case," and to judge whether that abstraction presents a serious potential risk of physical injury. James, supra,at 208, 127 S.Ct. 1586. The court's task goes beyond deciding whether creation of risk is an element of the crime. That is so because, unlike the part of the definition of a violent felony that asks whether the crime "has as an elementthe use ... of physical force," the residual clause asks whether the crime "involves conduct" that presents too much risk of physical injury. What is more, the inclusion of burglary and extortion among the enumerated offenses preceding the residual clause confirms that the court's task also goes beyond evaluating the chances that the physical acts that make up the crime will injure someone. The act of making an extortionate demand or breaking and entering into someone's home does not, in and of itself, normally cause physical injury. Rather, risk of injury arises because the extortionist might engage in violence aftermaking his demand or because the burglar might confront a resident in the home afterbreaking and entering.
We are convinced that the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges. Increasing a defendant's sentence under the clause denies due process of law.
A
Two features of the residual clause conspire to make it unconstitutionally vague. In the first place, the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime. It ties the judicial assessment of risk to a judicially imagined "ordinary case" of a crime, not to real-world facts or statutory elements. How does one go about deciding what kind of conduct the "ordinary case" of a crime involves? "A statistical analysis of the state reporter? A survey? Expert evidence? Google? Gut instinct?" United States v. Mayer,560 F.3d 948, 952 (C.A.9 2009)(Kozinski, C.J., dissenting from denial of rehearing en banc). To take an example, does the ordinary instance of witness tampering involve offering a witness a bribe? Or threatening a witness with violence? Critically, picturing the criminal's behavior is not enough; as we have already discussed, assessing "potential risk" seemingly requires the judge to imagine how the idealized ordinary *2558 case of the crime subsequently plays out. Jamesillustrates how speculative (and how detached from statutory elements) this enterprise can become. Explaining why attempted burglary poses a serious potential risk of physical injury, the Court said: "An armed would-be burglar may be spotted by a police officer, a private security guard, or a participant in a neighborhood watch program. Or a homeowner ... may give chase, and a violent encounter may ensue." 550 U.S., at 211, 127 S.Ct. 1586. The dissent, by contrast, asserted that any confrontation that occurs during an attempted burglary "is likely to consist of nothing more than the occupant's yelling 'Who's there?' from his window, and the burglar's running away." Id.,at 226, 127 S.Ct. 1586(opinion of SCALIA, J.). The residual clause offers no reliable way to choose between these competing accounts of what "ordinary" attempted burglary involves.
At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. It is one thing to apply an imprecise "serious potential risk" standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction. By asking whether the crime "otherwiseinvolves conduct that presents a serious potential risk," moreover, the residual clause forces courts to interpret "serious potential risk" in light of the four enumerated crimes-burglary, arson, extortion, and crimes involving the use of explosives. These offenses are "far from clear in respect to the degree of risk each poses." Begay,553 U.S., at 143, 128 S.Ct. 1581. Does the ordinary burglar invade an occupied home by night or an unoccupied home by day? Does the typical extortionist threaten his victim in person with the use of force, or does he threaten his victim by mail with the revelation of embarrassing personal information? By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates.
This Court has acknowledged that the failure of "persistent efforts ... to establish a standard" can provide evidence of vagueness. United States v. L. Cohen Grocery Co.,255 U.S. 81, 91, 41 S.Ct. 298, 65 L.Ed. 516 (1921). Here, this Court's repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm its hopeless indeterminacy. Three of the Court's previous four decisions about the clause concentrated on the level of risk posed by the crime in question, though in each case we found it necessary to resort to a different ad hoc test to guide our inquiry. In James,we asked whether "the risk posed by attempted burglary is comparable to that posed by its closest analog among the enumerated offenses," namely completed burglary; we concluded that it was. 550 U.S., at 203, 127 S.Ct. 1586. That rule takes care of attempted burglary, but offers no help at all with respect to the vast majority of offenses, which have no apparent analog among the enumerated crimes. "Is, for example, driving under the influence of alcohol more analogous to burglary, arson, extortion, or a crime involving use of explosives?"Id.,at 215, 127 S.Ct. 1586(SCALIA, J., dissenting).
Chambers,our next case to focus on risk, relied principally on a statistical report prepared by the Sentencing Commission to conclude that an offender who fails to report to prison is not "significantly more likely than others to attack, or physically to resist, an apprehender, thereby producing a 'serious potential risk of physical *2559 injury.' " 555 U.S., at 128-129, 129 S.Ct. 687. So much for failure to report to prison, but what about the tens of thousands of federal and state crimes for which no comparable reports exist? And even those studies that are available might suffer from methodological flaws, be skewed toward rarer forms of the crime, or paint widely divergent pictures of the riskiness of the conduct that the crime involves. See Sykes,564 U.S., at ---- - ----, 131 S.Ct., at 2285-2287(SCALIA, J., dissenting); id.,at ----, n. 4, 131 S.Ct., at 2291, n. 4(KAGAN, J., dissenting).
Our most recent case, Sykes, also relied on statistics, though only to "confirm the commonsense conclusion that Indiana's vehicular flight crime is a violent felony." Id.,at ----, 131 S.Ct., at 2274(majority opinion). But common sense is a much less useful criterion than it sounds-as Sykesitself illustrates. The Indiana statute involved in that case covered everything from provoking a high-speed car chase to merely failing to stop immediately after seeing a police officer's signal. See id.,at ----, 131 S.Ct., at 2289-2290(KAGAN, J., dissenting). How does common sense help a federal court discern where the "ordinary case" of vehicular flight in Indiana lies along this spectrum? Common sense has not even produced a consistent conception of the degree of risk posed by each of the four enumerated crimes; there is no reason to expect it to fare any better with respect to thousands of unenumerated crimes. All in all, James,Chambers,and Sykesfailed to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition.
The remaining case, Begay,which preceded Chambersand Sykes, took an entirely different approach. The Court held that in order to qualify as a violent felony under the residual clause, a crime must resemble the enumerated offenses "in kind as well as in degree of risk posed." 553 U.S., at 143, 128 S.Ct. 1581. The Court deemed drunk driving insufficiently similar to the listed crimes, because it typically does not involve "purposeful, violent, and aggressive conduct." Id.,at 144-145, 128 S.Ct. 1581(internal quotation marks omitted). Alas, Begaydid not succeed in bringing clarity to the meaning of the residual clause. It did not (and could not) eliminate the need to imagine the kind of conduct typically involved in a crime. In addition, the enumerated crimes are not much more similar to one another in kind than in degree of risk posed, and the concept of "aggressive conduct" is far from clear. Sykescriticized the "purposeful, violent, and aggressive" test as an "addition to the statutory text," explained that "levels of risk" would normally be dispositive, and confined Begayto "strict liability, negligence, and recklessness crimes." 564 U.S., at ---- - ----, 131 S.Ct., at 2275-2276.
The present case, our fifth about the meaning of the residual clause, opens a new front of uncertainty. When deciding whether unlawful possession of a short-barreled shotgun is a violent felony, do we confine our attention to the risk that the shotgun will go off by accident while in someone's possession? Or do we also consider the possibility that the person possessing the shotgun will later use it to commit a crime? The inclusion of burglary and extortion among the enumerated offenses suggests that a crime may qualify under the residual clause even if the physical injury is remote from the criminal act. But how remote is too remote? Once again, the residual clause yields no answers.
This Court is not the only one that has had trouble making sense of the residual *2560 clause. The clause has "created numerous splits among the lower federal courts," where it has proved "nearly impossible to apply consistently." Chambers,555 U.S., at 133, 129 S.Ct. 687(ALITO, J., concurring in judgment). The most telling feature of the lower courts' decisions is not division about whether the residual clause covers this or that crime (even clear laws produce close cases); it is, rather, pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider. Some judges have concluded that deciding whether conspiracy is a violent felony requires evaluating only the dangers posed by the "simple act of agreeing [to commit a crime]," United States v. Whitson,597 F.3d 1218, 1222 (C.A.11 2010)(per curiam); others have also considered the probability that the agreement will be carried out, United States v. White,571 F.3d 365, 370-371 (C.A.4 2009). Some judges have assumed that the battery of a police officer (defined to include the slightest touching) could "explode into violence and result in physical injury," United States v. Williams,559 F.3d 1143, 1149 (C.A.10 2009); others have felt that it "do[es] a great disservice to law enforcement officers" to assume that they would "explod[e] into violence" rather than "rely on their training and experience to determine the best method of responding," United States v. Carthorne,726 F.3d 503, 514 (C.A.4 2013). Some judges considering whether statutory rape qualifies as a violent felony have concentrated on cases involving a perpetrator much older than the victim, United States v. Daye,571 F.3d 225, 230-231 (C.A.2 2009); others have tried to account for the possibility that "the perpetrator and the victim [might be] close in age," United States v. McDonald,592 F.3d 808, 815 (C.A.7 2010). Disagreements like these go well beyond disputes over matters of degree.
It has been said that the life of the law is experience. Nine years' experience trying to derive meaning from the residual clause convinces us that we have embarked upon a failed enterprise. Each of the uncertainties in the residual clause may be tolerable in isolation, but "their sum makes a task for us which at best could be only guesswork." United States v. Evans,333 U.S. 483, 495, 68 S.Ct. 634, 92 L.Ed. 823 (1948). Invoking so shapeless a provision to condemn someone to prison for 15 years to life does not comport with the Constitution's guarantee of due process.
B
The Government and the dissent claim that there will be straightforward cases under the residual clause, because some crimes clearly pose a serious potential risk of physical injury to another. See post, at 2562 - 2563 (opinion of ALITO, J.). True enough, though we think many of the cases the Government and the dissent deem easy turn out not to be so easy after all. Consider just one of the Government's examples, Connecticut's offense of "rioting at a correctional institution." See United States v. Johnson,616 F.3d 85 (C.A.2 2010). That certainly sounds like a violent felony-until one realizes that Connecticut defines this offense to include taking part in "any disorder, disturbance, strike, riot or other organized disobedience to the rules and regulations" of the prison. Conn. Gen.Stat. § 53a-179b(a)(2012). Who is to say which the ordinary "disorder" most closely resembles-a full-fledged prison riot, a food-fight in the prison cafeteria, or a "passive and nonviolent [act] such as disregarding an order to move," Johnson,616 F.3d, at 95(Parker, J., dissenting)?
In all events, although statements in some of our opinions could be read to *2561 suggest otherwise, our holdingssquarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp. For instance, we have deemed a law prohibiting grocers from charging an "unjust or unreasonable rate" void for vagueness-even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable. L. Cohen Grocery Co.,255 U.S., at 89, 41 S.Ct. 298. We have similarly deemed void for vagueness a law prohibiting people on sidewalks from "conduct[ing] themselves in a manner annoying to persons passing by"-even though spitting in someone's face would surely be annoying. Coates v. Cincinnati,402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). These decisions refute any suggestion that the existence of someobviously risky crimes establishes the residual clause's constitutionality.
Resisting the force of these decisions, the dissent insists that "a statute is void for vagueness only if it is vague in all its applications." Post, at 2574. It claims that the prohibition of unjust or unreasonable rates in L. Cohen Grocerywas "vague in all applications," even though one can easily envision rates so high that they are unreasonable by any measure. Post, at 2582. It seems to us that the dissent's supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a statute to be vague, it is vague in all its applications (and never mind the reality). If the existence of some clearly unreasonable rates would not save the law in L. Cohen Grocery,why should the existence of some clearly risky crimes save the residual clause?
The Government and the dissent next point out that dozens of federal and state criminal laws use terms like "substantial risk," "grave risk," and "unreasonable risk," suggesting that to hold the residual clause unconstitutional is to place these provisions in constitutional doubt. See post,at 2558 - 2559. Not at all. Almost none of the cited laws links a phrase such as "substantial risk" to a confusing list of examples. "The phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, navy blue,or colors that otherwise involve shades of red' assuredly does so." James,550 U.S., at 230, n. 7, 127 S.Ct. 1586(SCALIA, J., dissenting). More importantly, almost all of the cited laws require gauging the riskiness of conduct in which an individual defendant engages on a particular occasion. As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as "substantial risk" to real-world conduct; "the law is full of instances where a man's fate depends on his estimating rightly ... some matter of degree," Nash v. United States,229 U.S. 373, 377, 33 S.Ct. 780, 57 L.Ed. 1232 (1913). The residual clause, however, requires application of the "serious potential risk" standard to an idealized ordinary case of the crime. Because "the elements necessary to determine the imaginary ideal are uncertain both in nature and degree of effect," this abstract inquiry offers significantly less predictability than one "[t]hat deals with the actual, not with an imaginary condition other than the facts." International Harvester Co. of America v. Kentucky,234 U.S. 216, 223, 34 S.Ct. 853, 58 L.Ed. 1284 (1914).
Finally, the dissent urges us to save the residual clause from vagueness by interpreting it to refer to the risk posed by the particular conduct in which the defendant engaged, not the risk posed by the ordinary case of the defendant's crime.
*2562 See post, at 2578 - 2580. In other words, the dissent suggests that we jettison for the residual clause (though not for the enumerated crimes) the categorical approach adopted in Taylor,see 495 U.S., at 599-602, 110 S.Ct. 2143, and reaffirmed in each of our four residual-clause cases, see James,550 U.S., at 202, 127 S.Ct. 1586; Begay,553 U.S., at 141, 128 S.Ct. 1581; Chambers,555 U.S., at 125, 129 S.Ct. 687; Sykes,564 U.S., ----, 131 S.Ct., at 2272-2273. We decline the dissent's invitation. In the first place, the Government has not asked us to abandon the categorical approach in residual-clause cases. In addition, Taylorhad good reasons to adopt the categorical approach, reasons that apply no less to the residual clause than to the enumerated crimes. Taylorexplained that the relevant part of the Armed Career Criminal Act "refers to 'a person who ... has three previous convictions' for-not a person who has committed-three previous violent felonies or drug offenses." 495 U.S., at 600, 110 S.Ct. 2143. This emphasis on convictions indicates that "Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." Ibid. Tayloralso pointed out the utter impracticability of requiring a sentencing court to reconstruct, long after the original conviction, the conduct underlying that conviction. For example, if the original conviction rested on a guilty plea, no record of the underlying facts may be available. "[T]he only plausible interpretation" of the law, therefore, requires use of the categorical approach. Id.,at 602, 110 S.Ct. 2143.
C
That brings us to stare decisis. This is the first case in which the Court has received briefing and heard argument from the parties about whether the residual clause is void for vagueness. In James,however, the Court stated in a footnote that it was "not persuaded by [the principal dissent's] suggestion ... that the residual provision is unconstitutionally vague." 550 U.S., at 210, n. 6, 127 S.Ct. 1586. In Sykes, the Court again rejected a dissenting opinion's claim of vagueness. 564 U.S., at ---- - ----, 131 S.Ct., at 2276-2277.
The doctrine of stare decisisallows us to revisit an earlier decision where experience with its application reveals that it is unworkable. Payne v. Tennessee,501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Experience is all the more instructive when the decision in question rejected a claim of unconstitutional vagueness. Unlike other judicial mistakes that need correction, the error of having rejected a vagueness challenge manifests itself precisely in subsequent judicial decisions: the inability of later opinions to impart the predictability that the earlier opinion forecast. Here, the experience of the federal courts leaves no doubt about the unavoidable uncertainty and arbitrariness of adjudication under the residual clause. Even after Sykestried to clarify the residual clause's meaning, the provision remains a "judicial morass that defies systemic solution," "a black hole of confusion and uncertainty" that frustrates any effort to impart "some sense of order and direction." United States v. Vann,660 F.3d 771, 787 (C.A.4 2011)(Agee, J., concurring).
This Court's cases make plain that even decisions rendered after full adversarial presentation may have to yield to the lessons of subsequent experience. See, e.g., United States v. Dixon,509 U.S. 688, 711, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993); Payne, 501 U.S., at 828-830, 111 S.Ct. 2597 (1991). But Jamesand Sykesopined about vagueness without full briefing *2563 or argument on that issue-a circumstance that leaves us "less constrained to follow precedent," Hohn v. United States,524 U.S. 236, 251, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998). The brief discussions of vagueness in Jamesand Sykeshomed in on the imprecision of the phrase "serious potential risk"; neither opinion evaluated the uncertainty introduced by the need to evaluate the riskiness of an abstract ordinary case of a crime. 550 U.S., at 210, n. 6, 127 S.Ct. 1586, 564 U.S., at ----, 131 S.Ct., at 2276-2277. And departing from those decisions does not raise any concerns about upsetting private reliance interests.
Although it is a vital rule of judicial self-government, stare decisisdoes not matter for its own sake. It matters because it "promotes the evenhanded, predictable, and consistent development of legal principles." Payne, supra,at 827, 111 S.Ct. 2597. Decisions under the residual clause have proved to be anything but evenhanded, predictable, or consistent. Standing by Jamesand Sykeswould undermine, rather than promote, the goals that stare decisisis meant to serve.
* * *
We hold that imposing an increased sentence under the residual clause of the Armed Career Criminal Act violates the Constitution's guarantee of due process. Our contrary holdings in Jamesand Sykesare overruled. Today's decision does not call into question application of the Act to the four enumerated offenses, or the remainder of the Act's definition of a violent felony.
We reverse the judgment of the Court of Appeals for the Eighth Circuit and remand the case for further proceedings consistent with this opinion.
It is so ordered.
Justice KENNEDY, concurring in the judgment.
In my view, and for the reasons well stated by Justice ALITO in dissent, the residual clause of the Armed Career Criminal Act is not unconstitutionally vague under the categorical approach or a record-based approach. On the assumption that the categorical approach ought to still control, and for the reasons given by Justice THOMAS in Part I of his opinion concurring in the judgment, Johnson's conviction for possession of a short-barreled shotgun does not qualify as a violent felony.
For these reasons, I concur in the judgment.
Justice THOMAS, concurring in the judgment.
I agree with the Court that Johnson's sentence cannot stand. But rather than use the Fifth Amendment's Due Process Clause to ify an Act of Congress, I would resolve this case on more ordinary grounds. Under conventional principles of interpretation and our precedents, the offense of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under the residual clause of the Armed Career Criminal Act (ACCA).
The majority wants more. Not content to engage in the usual business of interpreting statutes, it holds this clause to be unconstitutionally vague, notwithstanding the fact that on four previous occasions we found it determinate enough for judicial application. As Justice ALITO explains, that decision cannot be reconciled with our precedents concerning the vagueness doctrine. See post, at 2580 - 2581 (dissenting opinion). But even if it were a closer case under those decisions, I would be wary of holding the residual clause to be unconstitutionally vague. Although I have joined the Court in applying our modern vagueness *2564 doctrine in the past, see FCC v. Fox Television Stations, Inc., 567 U.S. ----, ---- - ----, 132 S.Ct. 2307, 2319-2320, 183 L.Ed.2d 234 (2012), I have become increasingly concerned about its origins and application. Simply put, our vagueness doctrine shares an uncomfortably similar history with substantive due process, a judicially created doctrine lacking any basis in the Constitution.
I
We could have easily disposed of this case without ifying ACCA's residual clause. Under ordinary principles of statutory interpretation, the crime of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under ACCA. In relevant part, that Act defines a "violent felony" as a "crime punishable by imprisonment for a term exceeding one year" that either
"(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
"(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B).
The offense of unlawfully possessing a short-barreled shotgun neither satisfies the first clause of this definition nor falls within the enumerated offenses in the second. It therefore can constitute a violent felony only if it falls within ACCA's so-called "residual clause"-i.e.,if it "involves conduct that presents a serious potential risk of physical injury to another." § 924(e)(2)(B)(ii).
To determine whether an offense falls within the residual clause, we consider "whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." James v. United States,550 U.S. 192, 208, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007). The specific crimes listed in § 924(e)(2)(B)(ii)-arson, extortion, burglary, and an offense involving the use of explosives-offer a "baseline against which to measure the degree of risk" a crime must present to fall within that clause. Id.,at 208, 127 S.Ct. 1586.Those offenses do not provide a high threshold, see id.,at 203, 207-208, 127 S.Ct. 1586, but the crime in question must still present a " 'serious' "-a " 'significant' or 'important' "-risk of physical injury to be deemed a violent felony, Begay v. United States,553 U.S. 137, 156, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008)(ALITO, J., dissenting); accord, Chambers v. United States,555 U.S. 122, 128, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009).
To qualify as serious, the risk of injury generally must be closely related to the offense itself. Our precedents provide useful examples of the close relationship that must exist between the conduct of the offense and the risk presented. In Sykes v. United States,564 U.S. 1, 131 S.Ct. 2267, 180 L.Ed.2d 60 (2011), for instance, we held that the offense of intentional vehicular flight constitutes a violent felony because that conduct always triggers a dangerous confrontation, id.,at ----, 131 S.Ct., at 2274. As we explained, vehicular flights "by definitional necessity occur when police are present" and are done "in defiance of their instructions ... with a vehicle that can be used in a way to cause serious potential risk of physical injury to another." Ibid.In James,we likewise held that attempted burglary offenses "requir[ing] an overt act directed toward the entry of a structure" are violent felonies because the underlying conduct often results in a dangerous confrontation. 550 U.S., at 204, 206, 127 S.Ct. 1586. But we distinguished those crimes from "the more *2565 attenuated conduct encompassed by" attempt offenses "that c[an] be satisfied by preparatory conduct that does not pose the same risk of violent confrontation," such as " 'possessing burglary tools.' " Id.,at 205, 206, and n. 4, 127 S.Ct. 1586. At some point, in other words, the risk of injury from the crime may be too attenuated for the conviction to fall within the residual clause, such as when an additional, voluntary act (e.g.,the useof burglary tools to enter a structure) is necessary to bring about the risk of physical injury to another.
In light of the elements of and reported convictions for the unlawful possession of a short-barreled shotgun, this crime does not "involv[e] conduct that presents a serious potential risk of physical injury to another," § 924(e)(2)(B)(ii). The acts that form the basis of this offense are simply too remote from a risk of physical injury to fall within the residual clause.
Standing alone, the elements of this offense-(1) unlawfully (2) possessing (3) a short-barreled shotgun-do not describe inherently dangerous conduct. As a conceptual matter, "simple possession [of a firearm], even by a felon, takes place in a variety of ways (e.g.,in a closet, in a storeroom, in a car, in a pocket) many, perhaps most, of which do not involve likely accompanying violence." United States v. Doe,960 F.2d 221, 225 (C.A.1 1992). These weapons also can be stored in a manner posing a danger to no one, such as unloaded, disassembled, or locked away. By themselves, the elements of this offense indicate that the ordinary commission of this crime is far less risky than ACCA's enumerated offenses.
Reported convictions support the conclusion that mere possession of a short-barreled shotgun does not, in the ordinary case, pose a serious risk of injury to others. A few examples suffice. In one case, officers found the sawed-off shotgun locked inside a gun cabinet in an empty home. State v. Salyers,858 N.W.2d 156, 157-158 (Minn.2015). In another, the firearm was retrieved from the trunk of the defendant's car. State v. Ellenberger,543 N.W.2d 673, 674 (Minn.App.1996). In still another, the weapon was found missing a firing pin. State v. Johnson,171 Wis.2d 175, 178, 491 N.W.2d 110, 111 (App.1992). In these instances and others, the offense threatened no one.
The Government's theory for why this crime should nonetheless qualify as a "violent felony" is unpersuasive. Although it does not dispute that the unlawful possession of a short-barreled shotgun can occur in a nondangerous manner, the Government contends that this offense poses a serious risk of physical injury due to the connection between short-barreled shotguns and other serious crimes. As the Government explains, these firearms are "weapons not typically possessed by law-abiding citizens for lawful purposes," District of Columbia v. Heller,554 U.S. 570, 625, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), but are instead primarily intended for use in criminal activity. In light of that intended use, the Government reasons that the ordinary case of this possession offense will involve the useof a short-barreled shotgun in a serious crime, a scenario obviously posing a serious risk of physical injury.
But even assuming that those who unlawfully possess these weapons typically intend to use them in a serious crime, the risk that the Government identifies arises not from the act of possessing the weapon, but from the act of using it. Unlike attempted burglary (at least of the type at issue in James) or intentional vehicular flight-conduct that by itself often or always invites a dangerous confrontation-possession of a short-barreled shotgun poses a threat onlywhen an offender decides *2566 to engage in additional, voluntary conduct that is not included in the elements of the crime. Until this weapon is assembled, loaded, or used, for example, it poses no risk of injury to others in and of itself. The risk of injury to others from mere possession of this firearm is too attenuated to treat this offense as a violent felony. I would reverse the Court of Appeals on that basis.
II
As the foregoing analysis demonstrates, ACCA's residual clause can be applied in a principled manner. One would have thought this proposition well established given that we have already decided four cases addressing this clause. The majority nonetheless concludes that the operation of this provision violates the Fifth Amendment's Due Process Clause.
Justice ALITO shows why that analysis is wrong under our precedents. See post, at 2580 - 2583 (dissenting opinion). But I have some concerns about our modern vagueness doctrine itself. Whether that doctrine is defensible under the original meaning of "due process of law" is a difficult question I leave for the another day, but the doctrine's history should prompt us at least to examine its constitutional underpinnings more closely before we use it to ify yet another duly enacted law.
A
We have become accustomed to using the Due Process Clauses to invalidate laws on the ground of "vagueness." The doctrine we have developed is quite sweeping: "A statute can be impermissibly vague ... if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado,530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). Using this framework, we have ified a wide range of enactments. We have struck down laws ranging from city ordinances, Papachristou v. Jacksonville,405 U.S. 156, 165-171, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), to Acts of Congress, United States v. L. Cohen Grocery Co.,255 U.S. 81, 89-93, 41 S.Ct. 298, 65 L.Ed. 516 (1921). We have struck down laws whether they are penal, Lanzetta v. New Jersey,306 U.S. 451, 452, 458, 59 S.Ct. 618, 83 L.Ed. 888 (1939), or not, Keyishian v. Board of Regents of Univ. of State of N. Y.,385 U.S. 589, 597-604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).[1]We have struck down laws addressing subjects ranging from abortion, Colautti v. Franklin,439 U.S. 379, 390, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), and obscenity, Winters v. New York,333 U.S. 507, 517-520, 68 S.Ct. 665, 92 L.Ed. 840 (1948), to the minimum wage, Connally v. General Constr. Co.,269 U.S. 385, 390-395, 46 S.Ct. 126, 70 L.Ed. 322 (1926), and antitrust, Cline v. Frink Dairy Co.,274 U.S. 445, 453-465, 47 S.Ct. 681, 71 L.Ed. 1146 (1927). We have even struck down a *2567 law using a term that has been used to describe criminal conduct in this country since before the Constitution was ratified.Chicago v. Morales,527 U.S. 41, 51, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)(invalidating a "loitering" law); see id.,at 113, and n. 10, 119 S.Ct. 1849(THOMAS, J., dissenting) (discussing a 1764 Georgia law requiring the apprehension of "all able bodied persons ... who shall be found loitering").
That we have repeatedly used a doctrine to invalidate laws does not make it legitimate. Cf., e.g., Dred Scott v. Sandford,19 How. 393, 450-452, 15 L.Ed. 691 (1857)(stating that an Act of Congress prohibiting slavery in certain Federal Territories violated the substantive due process rights of slaveowners and was therefore void). This Court has a history of wielding doctrines purportedly rooted in "due process of law" to achieve its own policy goals, substantive due process being the poster child. See McDonald v. Chicago,561 U.S. 742, 811, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010)(THOMAS, J., concurring in part and concurring in judgment) ("The one theme that links the Court's substantive due process precedents together is their lack of a guiding principle to distinguish 'fundamental' rights that warrant protection from nonfundamental rights that do not"). Although our vagueness doctrine is distinct from substantive due process, their histories have disquieting parallels.
1
The problem of vague penal statutes is nothing new. The notion that such laws may be void under the Constitution's Due Process Clauses, however, is a more recent development.
Before the end of the 19th century, courts addressed vagueness through a rule of strict construction of penal statutes, not a rule of constitutional law. This rule of construction-better known today as the rule of lenity-first emerged in 16th-century England in reaction to Parliament's practice of making large swaths of crimes capital offenses, though it did not gain broad acceptance until the following century. See Hall, Strict or Liberal Construction of Penal Statutes, 48 Harv. L. Rev. 748, 749-751 (1935); see also 1 L. Radzinowicz, A History of English Criminal Law and Its Administration From 1750, pp. 10-11 (1948) (noting that some of the following crimes triggered the death penalty: "marking the edges of any current coin of the kingdom," "maliciously cutting any hop-binds growing on poles in any plantation of hops," and "being in the company of gypsies"). Courts relied on this rule of construction in refusing to apply vague capital-offense statutes to prosecutions before them. As an example of this rule, William Blackstone described a notable instance in which an English statute imposing the death penalty on anyone convicted of "stealing sheep, or other cattle" was "held to extend to nothing but mere sheep" as "th[e] general words, 'or other cattle,' [were] looked upon as much too loose to create a capital offence." 1 Commentaries on the Laws of England 88 (1765).[2]
Vague statutes surfaced on this side of the Atlantic as well. Shortly after the First Congress proposed the Bill of Rights, for instance, it passed a law providing *2568 "[t]hat every person who shall attempt to trade with the Indian tribes, or be found in the Indian country with such merchandise in his possession as are usually vended to the Indians, without a license," must forfeit the offending goods. Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137-138. At first glance, punishing the unlicensed possession of "merchandise ... usually vended to the Indians," ibid.,would seem far more likely to "invit [e] arbitrary enforcement," ante,at 2557, than does the residual clause.
But rather than strike down arguably vague laws under the Fifth Amendment Due Process Clause, antebellum American courts-like their English predecessors-simply refused to apply them in individual cases under the rule that penal statutes should be construed strictly. See, e.g.,United States v. Sharp,27 F.Cas. 1041 (No. 16,264) (C.C.Pa. 1815) (Washington, J.). In Sharp,for instance, several defendants charged with violating an Act rendering it a capital offense for "any seaman" to "make a revolt in [a] ship," Act of Apr. 30, 1790, § 8, 1 Stat. 114, objected that "the offence of making a revolt, [wa]s not sufficiently defined by this law, or by any other standard, to which reference could be safely made; to warrant the court in passing a sentence upon [them]." 27 F.Cas., at 1043. Justice Washington, riding circuit, apparently agreed, observing that the common definitions for the phrase "make a revolt" were "so multifarious, and so different" that he could not "avoid feeling a natural repugnance, to selecting from this mass of definitions, one, which may fix a crime upon these men, and that too of a capital nature." Ibid. Remarking that "[l]aws which create crimes, ought to be so explicit in themselves, or by reference to some other standard, that all men, subject to their penalties, may know what acts it is their duty to avoid," he refused to "recommend to the jury, to find the prisoners guilty of making, or endeavouring to make a revolt, however strong the evidence may be." Ibid.
Such analysis does not mean that federal courts believed they had the power to invalidate vague penal laws as unconstitutional. Indeed, there is good evidence that courts at the time understood judicial review to consist "of a refusal to give a statute effect as operative law in resolving a case," a notion quite distinct from our modern practice of " 'strik[ing] down' legislation." Walsh, Partial Unconstitutionality, 85 N.Y.U. L. Rev. 738, 756 (2010). The process of refusing to apply such laws appeared to occur on a case-by-case basis. For instance, notwithstanding his doubts expressed in Sharp,Justice Washington, writing for this Court, later rejected the argument that lower courts could arrest a judgment under the same ship-revolt statute because it "does not define the offence of endeavouring to make a revolt." United States v. Kelly,11 Wheat. 417, 418, 6 L.Ed. 508 (1826). The Court explained that "it is ... competent to the Court to give a judicial definition" of "the offence of endeavouring to make a revolt," and that such definition "consists in the endeavour of the crew of a vessel, or any one or more of them, to overthrow the legitimate authority of her commander, with intent to remove him from his command, or against his will to take possession of the vessel by assuming the government and navigation of her, or by transferring their obedience from the lawful commander to some other person." Id.,at 418-419. In dealing with statutory indeterminacy, federal courts saw themselves engaged in construction, not judicial review as it is now understood.[3]
*2569 2
Although vagueness concerns played a role in the strict construction of penal statutes from early on, there is little indication that anyone before the late 19th century believed that courts had the power under the Due Process Clauses to ify statutes on that ground. Instead, our modern vagueness doctrine materialized after the rise of substantive due process. Following the ratification of the Fourteenth Amendment, corporations began to use that Amendment's Due Process Clause to challenge state laws that attached penalties to unauthorized commercial conduct. In addition to claiming that these laws violated their substantive due process rights, these litigants began-with some success-to contend that such laws were unconstitutionally indefinite. In one case, a railroad company challenged a Tennessee law authorizing penalties against any railroad that demanded "more than a just and reasonable compensation" or engaged in "unjust and unreasonable discrimination" in setting its rates. Louisville & Nashville R. Co. v. Railroad Comm'n of Tenn.,19 F. 679, 690 (C.C.M.D.Tenn.1884)(internal quotation marks deleted). Without specifying the constitutional authority for its holding, the Circuit Court concluded that "[n]o citizen ... can be constitutionally subjected to penalties and despoiled of his property, in a criminal or quasi criminal proceeding, under and by force of such indefinite legislation." Id.,at 693(emphasis deleted).
Justice Brewer-widely recognized as "a leading spokesman for 'substantized' due process," Gamer, Justice Brewer and Substantive Due Process: A Conservative Court Revisited, 18 Vand. L. Rev. 615, 627 (1965)-employed similar reasoning while riding circuit, though he did not identify the constitutional source of judicial authority to ify vague laws. In reviewing an Iowa law authorizing fines against railroads for charging more than a "reasonable and just" rate, Justice Brewer mentioned in dictum that "no penal law can be sustained unless its mandates are so clearly expressed that any ordinary person can determine in advance what he may and what he may not do under it." Chicago & N.W.R. Co. v. Dey,35 F. 866, 876 (C.C.S.D.Iowa 1888).
Constitutional vagueness challenges in this Court initially met with some resistance. Although the Court appeared to acknowledge the possibility of unconstitutionally indefinite enactments, it repeatedly rejected vagueness challenges to penal laws addressing railroad rates, Railroad Comm'n Cases,116 U.S. 307, 336-337, 6 S.Ct. 1191, 29 L.Ed. 636 (1886), liquor sales, Ohio ex rel. Lloyd v. Dollison,194 U.S. 445, 450-451, 24 S.Ct. 703, 48 L.Ed. 1062 (1904), and anticompetitive conduct, Nash v. United States,229 U.S. 373, 376-378, 33 S.Ct. 780, 57 L.Ed. 1232 (1913); Waters-Pierce Oil Co. v. Texas (No. 1),212 U.S. 86, 108-111, 29 S.Ct. 220, 53 L.Ed. 417 (1909).
*2570 In 1914, however, the Court ified a law on vagueness grounds under the Due Process Clause for the first time. In International Harvester Co. of America v. Kentucky,234 U.S. 216, 34 S.Ct. 853, 58 L.Ed. 1284 (1914), a tobacco company brought a Fourteenth Amendment challenge against several Kentucky antitrust laws that had been construed to render unlawful "any combination [made] ... for the purpose or with the effect of fixing a price that was greater or less than the real value of the article," id.,at 221, 34 S.Ct. 853. The company argued that by referring to "real value," the laws provided "no standard of conduct that it is possible to know." Ibid.The Court agreed. Id.,at 223-224, 34 S.Ct. 853. Although it did not specify in that case which portion of the Fourteenth Amendment served as the basis for its holding, ibid.,it explained in a related case that the lack of a knowable standard of conduct in the Kentucky statutes "violated the fundamental principles of justice embraced in the conception of due process of law." Collins v. Kentucky,234 U.S. 634, 638, 34 S.Ct. 924, 58 L.Ed. 1510 (1914).
3
Since that time, the Court's application of its vagueness doctrine has largely mirrored its application of substantive due process. During the Lochnerera, a period marked by the use of substantive due process to strike down economic regulations, e.g., Lochner v. New York,198 U.S. 45, 57, 25 S.Ct. 539, 49 L.Ed. 937 (1905), the Court frequently used the vagueness doctrine to invalidate economic regulations penalizing commercial activity.[4]Among the penal laws it found to be impermissibly vague were a state law regulating the production of crude oil, Champlin Refining Co. v. Corporation Comm'n of Okla.,286 U.S. 210, 242-243, 52 S.Ct. 559, 76 L.Ed. 1062 (1932), a state antitrust law, Cline,274 U.S., at 453-465, 47 S.Ct. 681, a state minimum-wage law, Connally,269 U.S., at 390-395, 46 S.Ct. 126, and a federal price-control statute, L. Cohen Grocery Co.,255 U.S., at 89-93, 41 S.Ct. 298.[5]
*2571 Around the time the Court began shifting the focus of its substantive due process (and equal protection) jurisprudence from economic interests to "discrete and insular minorities," see United States v. Carolene Products Co.,304 U.S. 144, 153, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), the target of its vagueness doctrine changed as well. The Court began to use the vagueness doctrine to invalidate noneconomic regulations, such as state statutes penalizing obscenity, Winters,333 U.S., at 517-520, 68 S.Ct. 665, and membership in a gang, Lanzetta,306 U.S., at 458, 59 S.Ct. 618.
Successful vagueness challenges to regulations penalizing commercial conduct, by contrast, largely fell by the wayside. The Court, for instance, upheld a federal regulation punishing the knowing violation of an order instructing drivers transporting dangerous chemicals to " 'avoid, so far as practicable ... driving into or through congested thoroughfares, places where crowds are assembled, street car tracks, tunnels, viaducts, and dangerous crossings,' " Boyce Motor Lines, Inc. v. United States,342 U.S. 337, 338-339, 343, 72 S.Ct. 329, 96 L.Ed. 367 (1952). And notwithstanding its earlier conclusion that an Oklahoma law requiring state employees and contractors to be paid " 'not less than the current rate of per diem wages in the locality where the work is performed' " was unconstitutionally vague, Connally, supra,at 393, 46 S.Ct. 126, the Court found sufficiently definite a federal law forbidding radio broadcasting companies from attempting to compel by threat or duress a licensee to hire " 'persons in excess of the number of employees needed by such licensee to perform actual services,' " United States v. Petrillo,332 U.S. 1, 3, 6-7, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947).
In more recent times, the Court's substantive due process jurisprudence has focused on abortions, and our vagueness doctrine has played a correspondingly significant role. In fact, our vagueness doctrine served as the basis for the first draft of the majority opinion in Roe v. Wade,410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), on the theory that laws prohibiting all abortions save for those done "for the purpose of saving the life of the mother" forced abortionists to guess when this exception would apply on penalty of conviction. See B. Schwartz, The Unpublished Opinions of the Burger Court 116-118 (1988) (reprinting first draft of Roe). Roe,of course, turned out as a substantive due process opinion. See 410 U.S., at 164, 93 S.Ct. 705. But since then, the Court has repeatedly deployed the vagueness doctrine to ify even mild regulations of the abortion industry. See Akron v. Akron Center for Reproductive Health, Inc.,462 U.S. 416, 451-452, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983)(ifying law requiring " 'that the remains of the unborn child [be] disposed of in a humane and sanitary manner' ");Colautti,439 U.S., at 381, 99 S.Ct. 675(ifying law mandating abortionists adhere to a prescribed standard of care if "there is 'sufficient reason to believe that the fetus may be viable' ").[6]
*2572 In one of our most recent decisions ifying a law on vagueness grounds, substantive due process was again lurking in the background. In Morales,a plurality of this Court insisted that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment," 527 U.S., at 53, 119 S.Ct. 1849, a conclusion that colored its analysis that an ordinance prohibiting loitering was unconstitutionally indeterminate, see id.,at 55, 119 S.Ct. 1849("When vagueness permeates the text of" a penal law "infring[ing] on constitutionally protected rights," "it is subject to facial attack").
I find this history unsettling. It has long been understood that one of the problems with holding a statute "void for 'indefiniteness' " is that " 'indefiniteness' ... is itself an indefinite concept," Winters, supra,at 524, 68 S.Ct. 665(Frankfurter, J., dissenting), and we as a Court have a bad habit of using indefinite concepts-especially ones rooted in "due process"-to invalidate democratically enacted laws.
B
It is also not clear that our vagueness doctrine can be reconciled with the original understanding of the term "due process of law." Our traditional justification for this doctrine has been the need for notice: "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited." United States v. Williams,553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008); accord, ante,at 2564. Presumably, that justification rests on the view expressed in Murray's Lessee v. Hoboken Land & Improvement Co.,18 How. 272, 15 L.Ed. 372 (1856), that "due process of law" constrains the legislative branch by guaranteeing "usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country," id.,at 277. That justification assumes further that providing "a person of ordinary intelligence [with] fair notice of what is prohibited," Williams, supra,at 304, 128 S.Ct. 1830, is one such usage or mode.[7]
To accept the vagueness doctrine as founded in our Constitution, then, one must reject the possibility "that the Due Process Clause requires only that our Government must proceed according to the 'law of the land'-that is, according to *2573 written constitutional and statutory provisions," which may be all that the original meaning of this provision demands. Hamdi v. Rumsfeld,542 U.S. 507, 589, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004)(THOMAS, J., dissenting) (some internal quotation marks omitted); accord, Turner v. Rogers,564 U.S. ----, ----, 131 S.Ct. 2507, 2521, 180 L.Ed.2d 452 (2011)(THOMAS, J., dissenting). Although Murray's Lesseestated the contrary, 18 How., at 276, a number of scholars and jurists have concluded that "considerable historical evidence supports the position that 'due process of law' was a separation-of-powers concept designed as a safeguard against unlicensed executive action, forbidding only deprivations not authorized by legislation or common law." D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789-1888, p. 272 (1985); see also, e.g., In re Winship,397 U.S. 358, 378-382, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)(Black, J., dissenting). Others have disagreed. See, e.g., Chapman & McConnell, Due Process as Separation of Powers, 121 Yale L.J. 1672, 1679 (2012)(arguing that, as originally understood, "the principle of due process" required, among other things, that "statutes that purported to empower the other branches to deprive persons of rights without adequate procedural guarantees [be] subject to judicial review").
I need not choose between these two understandings of "due process of law" in this case. Justice ALITO explains why the majority's decision is wrong even under our precedents. See post, at 2580 - 2583 (dissenting opinion). And more generally, I adhere to the view that " '[i]f any fool would know that a particular category of conduct would be within the reach of the statute, if there is an unmistakable core that a reasonable person would know is forbidden by the law, the enactment is not unconstitutional on its face,' " Morales, supra,at 112, 119 S.Ct. 1849(THOMAS, J., dissenting), and there is no question that ACCA's residual clause meets that description, see ante,at 2568 (agreeing with the Government that "there will be straightforward cases under the residual clause").
* * *
I have no love for our residual clause jurisprudence: As I observed when we first got into this business, the Sixth Amendment problem with allowing district courts to conduct factfinding to determine whether an offense is a "violent felony" made our attempt to construe the residual clause " 'an unnecessary exercise.' " James,550 U.S., at 231, 127 S.Ct. 1586(THOMAS, J., dissenting). But the Court rejected my argument, choosing instead to begin that unnecessary exercise. I see no principled way that, four cases later, the Court can now declare that the residual clause has become too indeterminate to apply. Having damaged the residual clause through our misguided jurisprudence, we have no right to send this provision back to Congress and ask for a new one. I cannot join the Court in using the Due Process Clause to ify an Act of Congress that contains an unmistakable core of forbidden conduct, and I concur only in its judgment.

By "penal," I mean laws "authoriz[ing] criminal punishment" as well as those "authorizing fines or forfeitures ... [that] are enforced through civil rather than criminal process." Cf. C. Nelson, Statutory Interpretation 108 (2011) (discussing definition of "penal" for purposes of rule of lenity). A law requiring termination of employment from public institutions, for instance, is not penal. See Keyishian,385 U.S., at 597-604, 87 S.Ct. 675. Nor is a law creating an "obligation to pay taxes." Milwaukee County v. M.E. White Co.,296 U.S. 268, 271, 56 S.Ct. 229, 80 L.Ed. 220 (1935). Conversely, a law imposing a monetary exaction as a punishment for noncompliance with a regulatory mandate is penal. See National Federation of Independent Business v. Sebelius,567 U.S. ----, ---- - ----, 132 S.Ct. 2566, 2650-2656, 183 L.Ed.2d 450 (2012)(SCALIA, KENNEDY, THOMAS, and ALITO, JJ., dissenting).

At the time, the ordinary meaning of the word "cattle" was not limited to cows, but instead encompassed all "[b]easts of pasture; not wild nor domestick." 1 S. Johnson, A Dictionary of the English Language (4th ed. 1773). Parliament responded to the judicial refusal to apply the provision to "cattle" by passing "another statute, 15 Geo. II. c. 34, extending the [law] to bulls, cows, oxen, steers, bullocks, heifers, calves, and lambs, by name." 1 Blackstone, Commentaries on the Laws of England, at 88.

Early American state courts also sometimes refused to apply a law they found completely unintelligible, even outside of the penal context. In one antebellum decision, the Pennsylvania Supreme Court did not even attempt to apply a statute that gave the Pennsylvania state treasurer " 'as many votes' " in state bank elections as " 'were held by individuals' " without providing guidance as to which individuals it was referring. Commonwealth v. Bank of Pennsylvania,3 Watts & Serg. 173, 177 (1842). Concluding that it had "seldom, if ever, found the language of legislation so devoid of certainty," the court withdrew the case. Ibid.; see also Drake v. Drake,15 N.C. 110, 115 (1833)("Whether a statute be a public or a private one, if the terms in which it is couched be so vague as to convey no definite meaning to those whose duty it is to execute it, either ministerially or judicially, it is necessarily inoperative"). This practice is distinct from our modern vagueness doctrine, which applies to laws that are intelligible but vague.

During this time, the Court would apply its new vagueness doctrine outside of the penal context as well. In A.B. Small Co. v. American Sugar Refining Co.,267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589 (1925), a sugar dealer raised a defense to a breach-of-contract suit that the contracts themselves were unlawful under several provisions of the Lever Act, including one making it " 'unlawful for any person ... to make any unjust or unreasonable ... charge in ... dealing in or with any necessaries,' or to agree with another 'to exact excessive prices for any necessaries,' " id.,at 238, 45 S.Ct. 295. Applying United States v. L. Cohen Grocery Co.,255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921), which had held that provision to be unconstitutionally vague, the Court rejected the dealer's argument. 267 U.S., at 238-239, 45 S.Ct. 295. The Court explained that "[i]t was not the criminal penalty that was held invalid, but the exaction of obedience to a rule or standard which was so vague and indefinite as really to be no rule or standard at all." Id.,at 239, 45 S.Ct. 295. That doctrine thus applied to penalties as well as "[a]ny other means of exaction, such as declaring the transaction unlawful or stripping a participant of his rights under it." Ibid.

Vagueness challenges to laws regulating speech during this period were less successful. Among the laws the Court found to be sufficiently definite included a state law making it a misdemeanor to publish, among other things, materials " 'which shall tend to encourage or advocate disrespect for law or for any court or courts of justice,' " Fox v. Washington,236 U.S. 273, 275-277, 35 S.Ct. 383, 59 L.Ed. 573 (1915), a federal statute criminalizing candidate solicitation of contributions for " 'any political purpose whatever,' " United States v. Wurzbach,280 U.S. 396, 398-399, 50 S.Ct. 167, 74 L.Ed. 508 (1930), and a state prohibition on becoming a member of any organization that advocates using unlawful violence to effect " 'any political change,' " Whitney v. California,274 U.S. 357, 359-360, 368-369, 47 S.Ct. 641, 71 L.Ed. 1095 (1927). But see Stromberg v. California,283 U.S. 359, 369-370, 51 S.Ct. 532, 75 L.Ed. 1117 (1931)(holding state statute punishing the use of any symbol " 'of opposition to organized government' " to be impermissibly vague).

All the while, however, the Court has rejected vagueness challenges to laws punishing those on the other side of the abortion debate. When it comes to restricting the speech of abortion opponents, the Court has dismissed concerns about vagueness with the observation that " 'we can never expect mathematical certainty from our language,' " Hill v. Colorado,530 U.S. 703, 733, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000), even though such restrictions are arguably "at least as imprecise as criminal prohibitions on speech the Court has declared void for vagueness in past decades," id.,at 774, 120 S.Ct. 2480(KENNEDY, J., dissenting).

As a general matter, we should be cautious about relying on general theories of "fair notice" in our due process jurisprudence, as they have been exploited to achieve particular ends. In BMW of North America, Inc. v. Gore,517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), for instance, the Court held that the Due Process Clause imposed limits on punitive damages because the Clause guaranteed "that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose," id.,at 574, 116 S.Ct. 1589. That was true even though "when the Fourteenth Amendment was adopted, punitive damages were undoubtedly an established part of the American common law of torts," and "no particular procedures were deemed necessary to circumscribe a jury's discretion regarding the award of such damages, or their amount." Pacific Mut. Life Ins. Co. v. Haslip,499 U.S. 1, 26-27, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)(SCALIA, J., concurring in judgment). Even under the view of the Due Process Clause articulated in Murray's Lessee,then, we should not allow nebulous principles to supplant more specific, historically grounded rules. See 499 U.S., at 37-38, 111 S.Ct. 1032(opinion of SCALIA, J.).