IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  40040-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GORDON LEE MCVAY, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — A jury found Gordan McVay guilty of assault in the third degree, violation of a no-contact order, and unlawful harboring of a minor.  The jury also returned a special verdict, finding the violation of a no-contact order was committed against an intimate partner.

Mr. McVay appeals his conviction for assault in the third degree, arguing the State committed misconduct in its rebuttal to his closing argument, as well as challenging the jury's finding of domestic violence, the imposition of a postconviction no-contact order, and the calculation of his offender score.  Mr. McVay raises an additional challenge to his offender score in a statement of additional grounds for review.

We disagree with Mr. McVay's contention that the prosecutor engaged in prejudicial misconduct and that his offender score was miscalculated. However, we remand for the trial court to strike the finding of domestic violence from the judgment and sentence, vacate the no-contact order, and reduce the term of the suspended sentence on the violation of the no-contact order conviction to a maximum of two years.

BACKGROUND

Mr. McVay and Loni Vargas were previously in an intimate relationship and begat a daughter. Ms. Vargas had another daughter, E.V., who was 17 years old in 2023. E.V. had a history of running away. In late 2022, Ms. Vargas was granted an antiharassment protection order that restrained Mr. McVay from contacting her and her children, including E.V.

On March 30, 2023, Ms. Vargas called E.V. and inadvertently heard E.V. and Mr. McVay speaking to one another. She overheard the two talking about going to Mr. McVay's mother's house, where Mr. McVay resided. Ms. Vargas terminated the call and phoned law enforcement.

Officers Brian Hewitt and Justin Malone responded to Mr. McVay's mother's house and questioned Mr. McVay about E.V.'s presence. Mr. McVay adamantly denied that E.V. was in the house, though it was later discovered that she was present. Officer Hewitt attempted to detain Mr. McVay while the officers investigated. Mr. McVay

No. 40040-9-III
*State v. McVay*

responded by wrapping his arm around Officer Malone's neck, putting him in what

Officer Malone described as a "guillotine choke." Rep. of Proc. (Oct. 19, 2023) at 676.

Mr. McVay was ultimately arrested and charged with third degree assault, violation of a no-contact order, resisting arrest, and unlawfully harboring a minor.[1] The information was later amended, alleging the violation of a no-contact order was committed against an intimate partner.

Prior to trial, the court calculated Mr. McVay's offender score. At issue was a conviction for felon in possession of a firearm out of the United States District Court from May 10, 2004, wherein Mr. McVay had been sentenced to 235 months of incarceration. In 2016, Mr. McVay was resentenced to 87 months in light of *Johnson v. United States*, 576 U.S. 591, 597, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015). Although Mr. McVay was released from custody shortly after the 2016 resentencing, he likely would have been released as early as 2010 had the 87-month sentence been originally imposed. Although Mr. McVay committed the crime of obstructing law enforcement in 2018, the court determined his offender score was "5" because his class C felonies washed out under a constructive release date of sometime between 2009 and 2011 on the federal conviction. Clerk's Papers (CP) at 136.

---

[1] The State moved to dismiss the charge of resisting arrest before trial.

3

Mr. McVay asserted his right to a jury trial, unrepresented by an attorney. At trial,

Ms. Vargas testified that she and Mr. McVay were intimate during their relationship and

that they might have a child in common. She asserted that she heard Mr. McVay's voice

with E.V. after E.V. "butt answered" her call. RP (Oct. 19, 2023) at 661. She also

testified that she heard them talk about getting food, tending to a puppy, and going to

Mr. McVay's mother's house. She testified that she called the police and was reunited

with E.V. later that day.

Officer Malone testified that he felt Mr. McVay's guillotine choke was

"intentional to me." RP (Oct. 19, 2023) at 679. Officer Malone stated:

> [Mr. McVay] continued to fight against Officer Hewitt and myself. At one
> point, he pulled his arm free of me. . . .
>
> So I went to take control of Mr. McVay's legs . . . [t]hat did not
> immediately prove effective.
> . . . .
>
> Mr. McVay took a large step away from me. He's quite a bit taller than I am,
> and so I was not able to wrap both of my arms around both of his legs. . . the
> way [we're] taught. And during that process, I tried to lift and still assist with
> the technique; however, Mr. McVay took his arm and wrapped it around my
> neck and began to tighten and squeeze it in a similar manner to what is
> commonly known as a *guillotine choke*.

RP (Oct. 19, 2023) at 675-76.

Mr. McVay testified that he was "attacked" by the police, was "cooperative" on

being detained, and never admitted to placing a guillotine choke on Officer Malone.

RP (Oct. 19-20, 2023) at 797, 885. Mr. McVay also testified that he felt he was

4

"righteous" in confronting the police on his doorstep.  RP (Oct. 20, 2023) at 884.

Mr. McVay claimed during his closing argument that he "like[d] kickin' em off [his]

property," and that "it shouldn't be right for [the police] to come in there and attack me

on my own property when I don't know [E.V.] was in the house."  RP (Oct. 20, 2023) at

1117, 1128.  He argued to the jury:

> I mean, I don't know if any of you believe in your constitutional rights, but
> I do and that's why me and the police bump heads. And that's why when
> they come there I know I have rights and I can tell 'em to leave, and I do
> because they're not there for nothin' good.

RP (Oct. 20, 2023) at 1127.

> In rebuttal to Mr. McVay's closing argument, the following exchange occurred:
>
> [THE STATE]: So obviously these people coming to the house, they don't
> like law enforcement. They're cussing at them already right from the get—
> go.
>
> [THE DEFENDANT]: Huh-uh.
>
> [THE STATE]: The defendant stated in his closing, "I fight. I fight good."
> So he actually did a pretty good job with that guillotine hold. And he
> admits himself that he does a good job fighting, and that specific move was
> intentional. He said he thought he was "righteous" in what he did. Well,
> let's think about that. Let's say every person in the country decides they get
> to choose what the law is. They get to say, *I don't agree with you, officer,*
> *so I get to do anything to you I want to*.
>
> [THE DEFENDANT]: Your Honor, I object to this because I didn't say
> none of that.
>
> [THE STATE]: It's rebuttal.
>
> [THE DEFENDANT]: It is rebuttal, but I didn't say none of that.

THE COURT: Overruled. It's argument.

[THE STATE]: And so this is—this is why we have laws. It is not a free license for people that—that don't agree with the law enforcement officer to then go assault an officer and then claim later, *I had a right to do that*. What you do is you fight it in court. You don't assault an officer.

RP (Oct. 20, 2023) at 1132-33.

The jury found Mr. McVay guilty of all three counts and returned a special verdict finding Mr. McVay and Ms. Vargas were intimate partners for purposes of the violation of a no-contact order conviction. The trial court calculated Mr. McVay's offender score at "9" at the time of sentencing. RP (Oct. 31, 2023) at 1212. With an offender score of 9, Mr. McVay's standard range sentence on the third degree assault was 51 to 60 months. The court imposed a 60-month sentence. The court suspended all of the jail time on the violation of the no-contact order conviction for a period of five years and suspended all of the jail time on the unlawful harboring of a minor conviction for a period of two years. The court issued a postconviction domestic violence no-contact order that prohibited Mr. McVay from having contact with Ms. Vargas for five years.

Mr. McVay timely appeals.

## ANALYSIS

### PROSECUTORIAL MISCONDUCT

Mr. McVay claims that the prosecutor committed misconduct during its rebuttal to his closing argument. We disagree.

We review allegations of prosecutorial misconduct under the abuse of discretion standard. *State v. Lindsay*, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). "Prosecutorial misconduct is grounds for reversal if 'the prosecuting attorney's conduct was both improper and prejudicial.'" *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (quoting *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009)). The defendant bears the burden of proving both prongs—improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Prejudice is established "if there is a substantial likelihood the misconduct affected the jury's verdict." *State v. Edvalds*, 157 Wn. App. 517, 522, 237 P.3d 368 (2010).

Prosecutors are granted "wide latitude" in summation to argue reasonable inferences to be drawn from the evidence at trial. *State v. Crossguns*, 199 Wn.2d 282, 296-97, 505 P.3d 529 (2022). Furthermore,

> remarks of the prosecutor, including such as would otherwise be improper, are not grounds for reversal where they are invited, provoked, or occasioned by defense counsel and where [the comments] are in reply to or retaliation for [defense counsel's] acts and statements, *unless such remarks go beyond a pertinent reply and bring before the jury extraneous matters not in the record*, or are so prejudicial that an instruction would not cure them.

*State v. Davenport*, 100 Wn.2d 757, 761, 675 P.2d 1213 (1984) (quoting *State v. La Porte*, 58 Wn.2d 816, 822, 365 P.2d 24 (1961)).

If a defendant fails to object at trial to the prosecutor's misconduct, then the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so

flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *Emery*, 174 Wn.2d at 760-61. "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id*. at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

Mr. McVay alleges the prosecutor engaged in misconduct when he: (1) misrepresented Mr. McVay's argument, claiming Mr. McVay admitted to intentionally assaulting the police officer and was "righteous" in doing so, (2) used the misrepresentations to inappropriately connect Mr. McVay's rationalizations for his behavior to greater societal ills, and (3) inappropriately associated Mr. McVay with those who dislike police. The State responds that the prosecutor's rebuttal to Mr. McVay's closing argument was proper because he drew reasonable inferences from the evidence and responded to Mr. McVay's argument and trial theme.

During the State's rebuttal to Mr. McVay's closing argument, the prosecutor argued:

> The defendant stated in his closing, "I fight. I fight good." So he actually did a pretty good job with that guillotine hold. And he admits himself that he does a good job fighting, and that specific move was intentional. He said he thought he was "righteous" in what he did. Well, let's think about that. Let's say every person in the country decides they get to choose what the law is. They get to say, *I don't agree with you, officer, so I get to do anything to you I want to*.

RP (Oct. 20, 2023) at 1132. Mr. McVay interjected, "I object to this because I didn't say none of that." RP (Oct. 20, 2023) at 1132. Thus, to succeed on appeal, Mr. McVay must show the statements were both improper and prejudicial. Because we deem the comments proper, the prosecutor did not commit misconduct in presenting the above-quoted argument.

Mr. McVay claims two instances of the prosecutor misstating the evidence, and a third instance of the prosecutor improperly connecting him to greater societal ills. Mr. McVay asserts the statement, "And he admits himself that he does a good job fighting, and that specific move was intentional" misstated the evidence because Mr. McVay never admitted to intentionally assaulting the officer. RP (Oct. 20, 2023) at 1132. However, the statement, "that specific move was intentional," is an independent clause and was not attributed to a comment made by Mr. McVay. RP (Oct. 20, 2023) at 1132. Rather, the statement was in reference to Officer Malone's testimony that the guillotine hold "was intentional to me." RP (Oct. 19, 2023) at 679.

Mr. McVay next claims that the prosecutor misrepresented the evidence by saying "[Mr. McVay] said he thought he was 'righteous' in what he did." RP (Oct. 20, 2023) at 1132. This statement was not a misrepresentation, but rather an accurate description of Mr. McVay's testimony of "I thought I was righteous. I thought I was righteous," and his closing argument where he claimed, "I came out there to find out what was goin' on

9

because I thought I was righteous.  And I like kickin' em off my property."  RP (Oct. 19-20, 2023) at 884, 1117.

Mr. McVay next asserts it was improper for the prosecutor to argue, "Let's say every person in the country decides they get to choose what the law is. They get to say, I don't agree with you, officer, so I get to do anything to you I want to."  RP (Oct. 20, 2023) at 1132.  He claims that this argument inappropriately linked his "righteous" statement to broader societal ills.

Prosecutors have "wide latitude" to argue reasonable inferences to be drawn from the evidence.  *Crossguns*, 199 Wn.2d at 296-97.  Here, the prosecutor's statement was in response to Mr. McVay's argument that "it shouldn't be right for [the police] to come in there and attack me on my own property when I don't know [E.V.] was in the house."  RP (Oct. 20, 2023) at 1128.  Because the challenged statement was in reply to Mr. McVay's argument, the statement was proper.  *Davenport*, 100 Wn.2d at 761.

Moreover, even if the challenged arguments were improper, Mr. McVay has failed to establish they were prejudicial.  Mr. McVay argues there was a reasonable likelihood the alleged misrepresentations affected the verdict because the body camera videos of the assault were underwhelming.  In addition to the video evidence, Officer Malone described the guillotine choke in detail and demonstrated the event for the jury. Thus, there was not a substantial likelihood the alleged misconduct affected the jury's

verdict. Accordingly, none of the objected to statements amounted to prosecutorial misconduct.

Mr. McVay challenges the appropriateness of two additional statements made by the prosecutor during rebuttal to Mr. McVay's closing argument, both presented without objection. Namely, Mr. McVay challenges a statement linking his case to lawlessness and associating him with those who dislike police.

First, Mr. McVay contends the following argument inappropriately linked his case to broader societal ills:

> And so this is—this is why we have laws. It is not a free license for people that—that don't agree with the law enforcement officer to then go assault an officer and then claim later, *I had a right to do that*. What you do is you fight it in court. You don't assault an officer.

RP (Oct. 20, 2023) at 1132-33. Second, Mr. McVay claims the following statement inappropriately associated him with those who dislike law enforcement: "[s]o obviously these people coming to the house, they don't like law enforcement. They're cussing at them already right from the get-go." RP (Oct. 31, 2023) at 1132.

As a preliminary matter, related to the first challenged statement, Mr. McVay argues that his objection, which immediately preceded this excerpt, put the court on notice of the ongoing error and thus preserved it for appeal. Whether Mr. McVay objected to either challenged statement is immaterial as the comments were properly made in reply to Mr. McVay's argument:

> I mean, I don't know if any of you believe in your constitutional rights, but I do and that's why me and the police bump heads. And that's why when they come there I know I have rights and I can tell 'em to leave, and I do because they're not there for nothin' good.

RP (Oct. 20, 2023) at 1127.[2]

Mr. McVay has failed to establish the challenged arguments were improper. Consequently, Mr. McVay has failed to demonstrate the prosecutor committed prejudicial misconduct during its rebuttal to his closing argument.

### DOMESTIC VIOLENCE FINDING ON NO-CONTACT ORDER CONVICTION

Mr. McVay challenges the domestic violence finding associated with the violation of the no-contact order conviction. The State argues that the jury properly found Mr. McVay's violation of a no-contact order conviction was a crime of domestic violence. We agree with Mr. McVay and reverse the finding of domestic violence.

---

[2] In support of his argument, Mr. McVay directs us to *State v. Loughbom*, where the Supreme Court held "that [a] prosecutor's multiple references to the war on drugs in a drug prosecution case amounted to reversible error." 196 Wn.2d 64, 71, 470 P.3d 499 (2020). This was the case even though the defendant failed to object to the "war on drugs" references throughout trial. *Id.* at 68. Albeit there may be similarities between referencing the "war on drugs" in a drug prosecution and lawlessness and societal upheaval in the assault of a police officer case, *Loughbom* is distinguishable. First, here, the prosecutor presented an isolated statement about lawlessness, whereas the prosecutor in *Loughbom* referenced the war on drugs several times, from jury selection to opening statement and closing argument. *Id.* at 67-68. Second, the prosecutor's statements against lawlessness here were simply in reply to Mr. McVay's closing argument, whereas the prosecutor in *Loughbom* seemingly made the "war on drugs" a theme of the trial. *Id.*

12

This court reviews a challenge to the sufficiency of the evidence to see if there is evidence from which the finder of fact could find each element of the offense proved beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980). This court "review[s] questions of statutory interpretation de novo to give effect to the legislature's intentions." *Rodriguez v. Zavala*, 188 Wn.2d 586, 591, 398 P.3d 1071 (2017). When possible, this court discerns legislative intent solely "from the plain language enacted by the legislature, considering the text of the provision itself, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole." *Id.*

A person "may petition for an antiharassment protection order on behalf of: [h]imself or herself [or a] minor child, where the petitioner is the parent, legal guardian, or custodian." RCW 7.105.100(f)(i-ii). "'Domestic violence' includes" the violation of a no-contact order, when committed by "one intimate partner against another intimate partner." RCW 10.99.020(4)(b). Intimate partners include "persons who have a child in common regardless of whether they have been married or have lived together at any time [and] adult persons presently or previously residing together who have or have had a dating relationship." RCW 10.99.020(8)(c)–(d).

Under the Sentencing Reform Act (SRA), of 1981, chapter 9.94A RCW, "'[v]ictim' means any person who has sustained emotional, psychological, physical, or financial injury to person or property as a direct result of the crime charged." RCW

13

9.94A.030(54). Furthermore, a "'[v]ictim of domestic violence' means an intimate partner or household member who has been subjected to the infliction of physical harm or sexual and psychological abuse by an intimate partner or household member as part of a pattern of assaultive, coercive, and controlling behaviors directed at achieving compliance from or control over that intimate partner or household member." RCW 9.94A.030(55).

Mr. McVay argues that his conviction for violation of his no-contact order that protected E.V. should not have been categorized as a crime of domestic violence as to Ms. Vargas because Ms. Vargas was not a "victim" of the crime. The State responds that Ms. Vargas qualified as a victim in light of the broad interpretation of "victim" under the SRA and analogous case law.

Although the State alleged in the amended information that E.V. was the victim of the crime of violation of a no-contact order, it claimed the offense was committed against Ms. Vargas, Mr. McVay's intimate partner. After returning a verdict of guilty to the charge of violation of a no-contact order, the jury returned a special verdict, finding Mr. McVay and Ms. Vargas as intimate partners for the purposes of RCW 10.99.020(8). Thus, the question is whether Ms. Vargas qualifies as a "victim" of the violation of a no-contact conviction.

The State argues that the broad definition of "victim" under the SRA includes a mother's fear for her child. RCW 9.94A.030(54); *Rodriguez*, 188 Wn.2d at 592. The

State further argues that Ms. Vargas must have been "necessarily fearful" for her daughter, E.V., when she learned of Mr. McVay violating the no-contact order because she had included E.V. in the protection order when she petitioned for it.[3] Br. of Resp't at 15.

Contrary to the State's argument, and even under a broad interpretation, a victim still must have "sustained emotional, psychological, physical, or financial injury to person or property as a direct result of the crime charged." RCW 9.94A.030(54). Furthermore, an intimate partner domestic violence victim must have "been subjected to the infliction of physical harm or sexual and psychological abuse by an intimate partner or household member as part of a pattern of assaultive, coercive, and controlling behaviors directed at achieving compliance from or control over that intimate partner or household member." RCW 9.94A.030(55). Finally, because the State charged domestic violence in the violation of the no-contact order, and because the statute requires such to be committed by "one intimate partner *against another* intimate partner[,]" Ms. Vargas

---

[3] The State also attempts to support this argument by referring to *State v. Abdi-Issa*, where the court held that a jury was "properly instructed that it could find animal abuse was a crime of domestic violence" because although a pet is not a human, it is nevertheless a person's property, and "[the human victim] was directly harmed as a result of [defendant's] violent killing of her beloved pet." 199 Wn.2d 163, 171-73, 504 P.3d 223 (2022). However, in that case the victim "sustained an injury as a direct result of the crime charged." *Id.* Ms. Vargas' testimony is devoid of evidence suggesting she was sufficiently "injured" to qualify as a victim. *Id.* at 172.

must have undergone some kind of injury to be considered a victim of domestic violence. RCW 10.99.020(4)(xviii) (emphasis added).

Here, there was no evidence of Ms. Vargas sustaining an injury under either definition. Ms. Vargas merely overheard a conversation between E.V. and Mr. McVay concerning getting food, tending to a puppy, and going to Mr. McVay's mother's house. Nothing in Ms. Vargas' testimony suggested that she "sustained emotional, psychological, physical, or financial injury. . . as a direct result of the crime charged." RCW 9.94A.030(54). Insufficient evidence was admitted to support a finding the violation of a no-contact order was committed against an intimate partner.

Accordingly, the crime of violation of a no-contact order was not a crime committed between "one intimate partner against another intimate partner," and was therefore not a crime of domestic violence. RCW 10.99.020(4)(xviii).

We reverse the finding of domestic violence and remand for the finding to be struck from the judgment and sentence. Relatedly, Mr. McVay requests we vacate the postconviction domestic violence no-contact order protecting Ms. Vargas. Because Ms. Vargas was not a victim, we vacate the domestic violence no-contact order as a condition of remand. RCW 10.99.050(1) ("When a defendant is found guilty of a crime and a condition of the sentence restricts the defendant's ability to have contact with the *victim*, such condition shall be recorded and a written certified copy of that order shall be provided to the victim.") (emphasis added); *State v. Polk*, 187 Wn. App. 380, 397-98, 348

16

P.3d 1255 (2015) ("A sentencing court has the discretion to impose *crime-related*

prohibitions. . . . The imposition of a no contact order prohibits conduct that *relates*

*directly to the circumstances of the crime charged.*") (emphasis added).

Lastly, we remand for the trial court to reduce the term of the suspended sentence

on the violation of a no-contact order conviction. Violation of a no-contact order is a

gross misdemeanor. RCW 7.105.455(2)(a). Unless a conviction is for a domestic

violence offense or driving under the influence, the superior court may suspend a

sentence for a maximum of two years. RCW 9.95.210(1)(b). Here, with the finding that

the violation of a no-contact order was committed against an intimate partner, the court

suspended Mr. McVay's sentence for five years. Because we reverse the finding of

domestic violence, the term of the suspended sentence must be reduced to a maximum of

two years.

We reverse the finding that Mr. McVay's conviction for violation of a no-contact

order was a crime of domestic violence. We remand for the trial court to strike the

domestic violence finding from the judgment and sentence and reduce the term of the

suspended sentence to a maximum of two years.

OFFENDER SCORE CALCULATION

Mr. McVay argues that his offender score was improperly calculated. We

disagree.

This court reviews "questions of statutory interpretation de novo to give effect to the legislature's intentions." *Rodriguez*, 188 Wn.2d at 591. When interpreting a statute, this court gives effect to the statute's plain meaning when it can be determined from the statute's text. *State v. Marquette*, 6 Wn. App. 2d 700, 703, 431 P.3d 1040 (2018).

An "offender score is the sum of points accrued as a result of prior convictions." *State v. Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187 (2014). RCW 9.94A.525(2)(c) relevantly provides that:

> Class C prior felony convictions . . . shall not be included in the offender score if, since the last date of release from confinement . . . pursuant to a felony conviction, if any, or entry of judgment and sentence, the offender had spent five consecutive years in the community without committing any crime that subsequently results in a conviction.

*State v. Smith*, 137 Wn. App. 431, 439, 153 P.3d 898 (2007).

Mr. McVay argues that his offender score was improperly calculated because the time he was "invalidly" confined should not count as "confinement" under the statute. Br. of Appellant at 54. He argues that if his constructive release date, rather than his actual release date, is used as the starting point to measure the required five years in the community without committing a crime, then several of his prior felony convictions would have "washed out" of his score. *Id*. at 56. The State responds that his score was properly calculated because the statute's plain language, its policy, and applicable case law support that confinement pursuant to a later ruled erroneous or invalid sentence is still confinement. We agree with the State.

In May 2004, Mr. McVay was sentenced to 235 months of incarceration for being a felon in possession of a firearm. He was resentenced in 2016 to 87 months in light of *Johnson v. United States*, which held that the imposition of an aggravated sentence under the relevant residual clause of the Armed Career Criminal Act was vague and therefore violated due process. 576 U.S. at 597. Mr. McVay was released from confinement in 2016 and would have been released as early as 2010 under the 87-month sentence. In 2018, Mr. McVay committed the crime of obstructing law enforcement that interrupted his washout period.

Mr. McVay accordingly argues that his offender score washout period should have commenced in 2010, which would have resulted in the several class C felonies washing out, thereby reducing his offender score under RCW 9.94A.525(2)(c).

The plain language of "the last date of release from confinement" contained in RCW 9.94A.525(2)(c) supports using the actual release date from confinement as the commencement for purposes of determining whether any offense has washed out. Under the plain language of the statute, Mr. McVay's release from confinement was in 2016, not constructively in 2010.

Further, we addressed a similar issue in *State v. Smith*, where the defendant argued that his offender score should have been calculated from when he *should* have been released, rather than when he was actually released. 137 Wn. App. at 439-40. In *Smith*, we declined to use a constructive release date, noting that the defendant did not "contend

19

that the sentencing court lacked jurisdiction to impose the sentence that extended past [the constructive release date,]" the trial court had jurisdiction when it imposed the sentence, and that a conviction and sentence remains valid "until an appellate court overturn[s the] sentence." *Id.* at 440. We explained that "the legislature intended to reward only those defendants who spend five consecutive years in the community without committing a crime." *Id.*

Similarly, here, nothing in the record suggests the federal court lacked jurisdiction when it imposed the sentence, and Mr. McVay's conviction and sentence remained valid until at least 2015, when *Johnson* overturned the law governing his sentence.[4] 576 U.S. at 597. Furthermore, using the constructive release date would contravene the legislature's policy for defendants to show they could be in the community for five years without committing a new crime.

Accordingly, Mr. McVay's date of release for purposes of calculating his offender score was 2016. The trial court did not miscalculate his offender score.

---

[4] Mr. McVay does argue that "*confinement* pursuant to an unconstitutional conviction, one the court had no authority to enter, essentially renders void the confinement referred in RCW 9.94A.525(2)(c)'s first clause pursuant to such a conviction." Br. of Appellant at 55. However, this argument is meritless because in the same breath, he only contends that the government did not have authority to confine him after his constructive release date. He does not argue that the court had no jurisdiction in the federal conviction and sentence.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW (SAG)

RAP 10.10(a) permits a defendant to file a pro se SAG if he believes his appellate counsel has not adequately addressed certain matters. Mr. McVay filed a SAG raising one issue.

Mr. McVay argues that the sentencing court miscalculated his offender score, and he particularly emphasizes that another judge had tentatively reached a different decision in a pretrial hearing that his prior felonies may not count toward his offender score. We disagree.

On September 18, 2023, a pretrial CrR 3.5 and 3.6 suppression and offender score determination hearing was held. There, the judge essentially accepted Mr. McVay's constructive release date between 2009 and 2011 and ruled that all of his class C felonies washed out, resulting in a score of 5. However, on October 31, the sentencing court made the final determination that Mr. McVay had an offender score of 9.

A sentencing court decides an offender score on the day of sentencing and is not bound by a prior decision on a defendant's offender score. RCW 9.94A.525(1)(A) ("A prior conviction is a conviction which exists before *the date of sentencing for the offense for which the offender score is being computed*.") (emphasis added); *State v. Wright*, 76 Wn. App. 811, 829, 888 P.2d 1214 (1995) ("[T]he current sentencing court is not bound by an earlier determination of whether to count the offenses as one offense or separate offenses.").

Here, the sentencing court was not bound by the earlier pretrial ruling on Mr. McVay's offender score. Moreover, the pretrial score determination was "for the purposes of plea negotiations, but it was not a final determination." RP (Oct. 31, 2023) at 1213. Thus, Mr. McVay's offender score was properly calculated by the sentencing court.

CONCLUSION

We affirm Mr. McVay's assault in the third degree conviction and offender score. We remand for the trial court to strike the finding of domestic violence from the judgment and sentence, vacate the no-contact order, and reduce the term of the suspended sentence on the violation of the no-contact order conviction to a maximum of two years.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Fearing, J.

_____
Lawrence-Berrey, C.J.

22