Filed 8/21/25  P. v. Gonzalez CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062473 |
| v. | (Super. Ct. No. 19HF0174) |
| EDUARDO GODOY GONZALEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Terri K. Flynn-Peister, Judge. Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Caelle McKaveney, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

Eduardo Gonzalez appeals from a judgment finding him guilty of, inter alia, aggravated kidnapping with intent to commit rape. He contends the judgment should be reversed for three reasons: (1) there was no substantial evidence to support the jury's finding that the movement of the victim satisfied the asportation element of aggravated kidnapping under Penal Code section 209[1]; (2) section 209 is unconstitutionally vague; and (3) the trial court erred in admitting certain prior-acts evidence under Evidence Code section 1101, subdivision (b).

We reject each contention. First, the evidence showed defendant moved the victim to a more secluded location, away from possible escape or detection, to facilitate a sexual assault. That satisfied the asportation element. Second, the court in *People v. Ledesma* (2017) 14 Cal.App.5th 830 (*Ledesma*) already rejected the void-for-vagueness argument Gonzalez raises here, and we find the *Ledesma* analysis persuasive. Finally, even assuming some prior-acts evidence should have been excluded, any error was harmless in light of defendant's admissions and the overwhelming evidence of guilt.

STATEMENT OF FACTS

I.

THE ATTEMPTED RAPE

In the early morning hours of February 6, 2019, Jane Doe was working at her overnight job as a cleaning person in an office building in Irvine. Doe was vacuuming a room near the entrance, which had a transparent glass wall, when she was saw Gonzalez come into the building. Gonzalez checked to see if the victim was alone and briefly looked around the

---

[1] All statutory references are to the Penal Code unless stated otherwise.

office space. He returned to the front room where Doe was working and asked if she wanted to have sex with him. He told Doe he had condoms and asked her to remove her clothes. Doe responded that he was crazy and to leave before getting out her phone to call the police. Gonzalez pulled out what appeared to be a handgun and threatened to kill her if she called anyone or if she did not take off her clothes. He also had a knife clipped to his waistband. Fearful, Doe pleaded with Gonzalez not to harm her as she had three young children. Gonzalez stated he did not care.

Gonzalez pulled Doe down the hallway into another room, which did not have a transparent wall, and where they were no longer visible from the hallway. He "just wanted to have sex with her" and intended to do so regardless of her consent.

Doe attempted to defend herself from the attack while being dragged down the hall. Once Gonzalez and Doe had entered into the second, side room, he started to pull his pants down and attempted to pull Doe's pants down as well.

Doe was eventually able to remove the vacuum strapped to her back and grab the gun from Gonzalez. Doe, now in possession of the gun, threatened to kill Gonzalez, but he laughed and informed her the gun was fake. She then ran from the room to which Gonzalez had dragged her, back towards the front room, and to her coworker in an adjacent building for help. Upon hearing Doe's screams for help, appellant fled the scene in attempts to avoid arrest.

Police later recovered and identified that "gun" as a replica of a Glock semi-automatic firearm. As a result of Gonzalez's attack, Doe sustained a torn shoulder muscle in addition to various scratches, bruises, and soreness on her face, elbows, and breasts.

Irvine Police located Gonzalez at a grocery store the next day. Gonzalez initially denied his involvement in the crime and only admitted he sexually assaulted Doe after being shown the incriminating surveillance video. Gonzalez admitted to detectives that after the victim denied his sexual advances, "[He] got aggressive, and [he] started pushing her against the wall, and [he] took her to another room." When asked by detectives why he had dragged Doe into that side room, Gonzalez answered because there were beds in that room and he wanted to rape her there.

## II.

### THE CHARGES AND THE TRIAL

By way of amended information, Gonzalez was charged with kidnapping to commit a sex offense (count 1, § 209, subd. (b)(1)); assault with the intent to commit a sexual offense (count 2, § 220, subd. (a)(1)); criminal threats (count 3, § 422, subd. (a)); burglary in the second degree (count 4, §§ 459-460, subd. (b)); and brandishing an imitation firearm, a misdemeanor, (count 5, § 417.4.) The information alleged three aggravating factors as to counts 2 through 4: (1) That the offense involved great violence, great bodily harm or threat of great bodily harm (Cal. Rules of Court, rule 4.421 (a)(1)); (2) That the defendant was armed with and used a weapon, including fake firearm and or a pocket knife (Cal. Rules of Court, rule 4.421 (a)(2)); and (3) That the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421 (a)(3)).

At trial, the People put on evidence of two prior incidents pursuant to Evidence Code section 1101, subdivision (b).

The first incident occurred on January 13, 2019, a few weeks before Gonzalez attempted to rape Doe. Shortly before 7:00 p.m., Maria G. left the gym where she had been working out and was walking through a

4

Carl's Jr. parking lot when she was approached by Gonzalez. He spoke to her in English and the only word she understood was "money." She told him she did not speak English, did not have any money, and started walking away. Gonzalez said he spoke Spanish and he was not asking for money, but said he had some money and asked if she would have sex with him if he gave her money. Maria said, "No, no, thank you," and continued walking. The man kept walking with her and asked why not, and she said he was crazy and that if he did not go away, she would call the police.

He went back to the Carl's Jr. but then came back to Maria again on a skateboard. She turned and walked toward him, telling him she had already called the police and he responded, "So what? What [are] the police . . . going to do to me?" Maria was afraid because they were in an isolated area, so she engaged him in conversation, and asked him why he was doing this when he was so handsome and should not have to pay for sex, and invited him to walk with her. He walked with her toward Edinger Avenue, and he invited Maria to dinner and asked for her phone number. Maria gave him her phone number, and had him call the number so she had his number. He told her his name was Eduardo and that he was a member of the same gym. They walked together to a more well-lit area, and she told him goodbye, and he stopped following her. After she got home she received a text from him.

Maria told her boyfriend about the incident, and he used the phone number to confirm the man was actually a member at their gym. Maria identified a photo on the gym's computer as being the same person. A few weeks later, Maria contacted the police after seeing a news story about the incident in Irvine, and she recognized a photo of Gonzalez shown on the news.

In the second incident, Ms. Avalos testified that she was working a graveyard shift at a Santa Ana medical clinic on February 5-6, 2019, the night of the attempted rape of Doe. Early in the morning on the 6th (prior to the attempted rape of Doe), Avalos noticed someone walking around the building and looking in the windows. She believed it was a male, and she saw him walk around and look in several windows before approaching the front door of the clinic. He pulled on the main door, but it was locked. He buzzed the intercom and asked if he could come in and use the restroom. Avalos told him over the intercom that the clinic was closed, and after pulling on the door one more time, she saw the man walk away. Gonzalez admitted it was him at the office building.

At trial, Gonzalez testified and admitted essentially everything Doe had testified to. During closing argument, Gonzalez's counsel made no argument as to counts 2 through 5 and instead focused entirely on the aggravated kidnapping charge (§ 209). His counsel argued that the asportation element of that crime had not been proven.

The jury returned verdicts of guilty on all counts. Gonzalez waived his right to a jury on the aggravating factors, and in a bench trial on March 24, 2023, the court found each of the allegations to be true. The court then imposed a term of life with parole for count 1 and ordered the upper terms for counts 2 through 4 imposed and stayed pursuant to section 654. Sentence on count 5 was set at 30 days and deemed time served. Appellant's total term of imprisonment was life with the possibility of parole. Defendant appealed.

DISCUSSION

I.

SUBSTANTIAL EVIDENCE SUPPORTS THE ASPORTATION FINDING

Gonzalez first contends there was insufficient evidence to support the asportation element of the kidnapping charge. We review that contention for substantial evidence. (*People v. Johnson* (1980) 26 Cal.3d 557, 577.)

Section 209, subdivision (b)(1), punishes kidnapping to commit robbery, rape, or other enumerated sex offenses. Subdivision (b)(2) provides: "This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." "These two aspects are not mutually exclusive, but interrelated." (*People v. Rayford* (1994) 9 Cal.4th 1, 12 (*Rayford*).)

The jury was instructed with CALCRIM No. 1203, which required proof of: (1) intent to commit rape; (2) taking or detaining another by force or fear; (3) moving the person a substantial distance by force or fear; (4) movement beyond that merely incidental to rape; (5) intent to commit rape prior to the movement; and (6) lack of consent. It defined "substantial distance" as "more than a slight or trivial distance" that "must have increased the risk of harm to the person beyond that necessarily present in the rape," and it directed the jury to consider "all the circumstances" in deciding if the movement was substantial.

The California Supreme Court in *Rayford* explained that in determining whether the movement is merely incidental to the commission of the underlying crime, the jury considers the " 'scope and nature' of the movement," as well as the "context of the environment in which the movement occurred." "This includes the actual distance a victim is moved.

7

However, . . . there is no minimum number of feet a [victim] must [be] move[d] in order to satisfy" the asportation requirement. (*Rayford, supra,* 9 Cal.4th at p. 12.)

On the increased risk of harm, *People v. Dominguez* (2006) 39 Cal.4th 1141, 1152, instructed: "The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement. [Citation.] We have articulated various circumstances the jury should consider, such as whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes." And importantly: "The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased." (*Rayford, supra,* 9 Cal.4th at p. 14.)

*People v. Shadden* (2001) 93 Cal.App.4th 164 upheld the asportation element of kidnapping to commit rape where a defendant moved the victim only nine feet into a back room. The defendant argued the movement was insubstantial. "But 'a rape . . . does not necessarily require movement to complete the crime.' [Citation.] Where a defendant drags a victim to another place, and then attempts a rape, the jury may reasonably infer that the movement was neither part of nor necessary to the rape." In such cases, "[t]he critical factor" is whether the defendant "secluded or confined the victim," thereby "decreas[ing] the odds of detection." (*Id.* at pp. 169-170.)

Gonzalez argues that: The distance was minimal; the movement occurred during the sexual assault and was inseparable from it; and Doe was never moved far enough from potential help to increase her risk. In arguing these factors require reversal, Gonzalez draws heavily from cases involving

8

robberies where movement of the victims within the confines of a building was deemed incidental to the crime. (See *People v. Daniels* (1969) 71 Cal.2d 1119 (movement within a residence); *People v. Washington* (2005) 127 Cal.App.4th 290 (movement from a teller area to a bank vault); *People v. Hoard* (2002) 103 Cal.App.4th 599 (movement from the front of a jewelry store to the back office while the robbers ransacked the front)).

We disagree with Gonzalez and find the robbery cases distinguishable. Unlike the robbery cases, where the movement within the confines of a building was necessary to reach the property to be stolen and did not significantly increase the risk of harm to the victims, it was not necessary to move Doe in order to commit rape. As the *Shadden* court noted, rape is an assault on the person and thus no movement is necessary. As such, it was not incidental to the crime to drag her into another room. Indeed, Gonzalez testified that there were couches in the room where he initially confronted Doe and that he could have raped her there. Moreover, there was substantial evidence that the room where Gonzalez dragged Doe was more secluded in that it did not have a glass wall like the front entry where Gonzalez first confronted Doe. It was also farther from Doe's means of escape. Because the movement reduced the likelihood of detection, made escape more difficult, and thereby increased the opportunity for further assault, the movement was substantial.

## II.

### SECTION 209 IS NOT UNCONSTITUTIONALLY VAGUE

Next, Gonzalez contends section 209 is unconstitutionally vague. His argument principally relies on linking the analysis under section 209 with the sort of analysis the United States Supreme Court found to be unconstitutionally vague in *Johnson v. United States* (2015) 576 U.S. 591

9

(*Johnson*). However, this exact argument was rejected in *Ledesma, supra,* 14 Cal.App.5th 830, which we find convincing. Below, we begin by explaining the void-for-vagueness doctrine, then discuss *Johnson*, and conclude by explaining why we find *Ledesma* persuasive.

The void-for-vagueness doctrine is rooted in due process. It requires penal statutes to give "ordinary people fair notice of the conduct it punishes" and prohibits statutes that are "so standardless that it invites arbitrary enforcement." (*Johnson, supra,* 576 U.S. 591at p. 595) A statute is not unconstitutionally vague simply because it requires interpretation; "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." (*Grayned v. City of Rockford* (1972) 408 U.S. 104, 110.) Rather, a statute fails for vagueness only if it is so indeterminate that it both denies fair notice to defendants and invites arbitrary enforcement by judges. (*Johnson*, *supra*, 576 U.S. at p. 595.)

Only a reasonable degree of certainty is required, and there is a strong presumption in favor of the constitutionality of statutes. (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1107.) "[L]egislative enactments 'must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears.'" (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 143.)

In *Johnson*, the United States Supreme Court considered the federal Armed Career Criminal Act (ACCA), which mandated enhanced sentences for offenders with three prior convictions for a "violent felony." The statute defined "violent felony" to include certain enumerated offenses or any offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." (18 U.S.C. § 924, subd. (e)(2)(B)(ii).) That last portion — the "residual clause" — was at issue. The residual clause required courts to: (1) identify the abstract "ordinary case" of a crime, not the facts of

10

the defendant's actual offense; (2) then, assess whether that ordinary case "abstraction presents a serious potential risk of physical injury" comparable to the enumerated crimes (i.e. burglary, arson, extortion, or use of explosives). (*Johnson, supra,* 576 U.S. at pp. 594, 596.)

The Court concluded this framework was impermissibly vague for two independent reasons. (*Johnson, supra,* 576 U.S. at p. 597.) First, there was no reliable way to choose between competing accounts of what the ordinary case looks like in the abstract, making the inquiry inherently speculative. (*Ibid.*) Second, the clause offered no yardstick for how much risk qualified as "serious potential risk," creating "uncertainty about how much risk it takes for a crime to qualify as a violent felony . . . ." (*Id.* at p. 598.) The combination of an abstract, hypothetical offense and an imprecise risk standard rendered the residual clause too unpredictable and arbitrary to satisfy due process. (*Ibid.*) Importantly, the problem in *Johnson* was not simply that a court had to think hypothetically; it was that the hypothetical was divorced from any real-world facts and thus left the analysis unmoored from objective criteria. "As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct . . . ." (*Id.* at pp. 603-604.)

In *Ledesma*, the Court of Appeal considered — and rejected — the same void-for-vagueness challenge Gonzalez raises here. The defendant argued that the asportation element in section 209, subdivision (b)(2), was just as indeterminate as ACCA's residual clause because it required the trier of fact to decide whether the movement was "merely incidental" and whether it "increased the risk of harm," both of which he characterized as vague and standardless. (*Ledesma, supra*, 14 Cal.App.5th at p. 835.)

11

*Ledesma* disagreed, emphasizing that the asportation requirement of section 209, subdivision (b)(2), does not require courts to imagine an abstract ordinary case divorced from real-world facts. Rather, the statute directs the trier of fact to assess actual conduct — the movement of the actual victim in the actual case — and to determine whether that movement went beyond what was necessary to commit the intended crime and increased the risk of harm. (*Id.* at p. 839-840.) This "appl[ication] of a legal standard to real-world facts," the court concluded, is not constitutionally problematic, and any variability in results simply reflects the statute's fact-specific application. (*Id.* at pp. 838-40.) As the *Ledesma* court astutely observed, "In contrast [to the federal cases applying the ACCA], California cases on the asportation element of aggravated kidnapping . . . show broad agreement on both the nature of the inquiry required and the relevant factors to evaluate when deciding whether the facts in a case are sufficient to satisfy the asportation element of the aggravated kidnapping statute . . . ." (*Id.* at p. 839.)

We agree with *Ledesma's* analysis. The analysis called for under section 209 is clear on its face and does not suffer the flaws that the Supreme Court condemned in *Johnson*. If there has been difficulty applying the kidnapping statute over the years, it is not because the statute itself is vague, but rather because Courts of Appeal routinely deal with edge cases that require difficult judgment calls. That is the inevitable byproduct of any law trying to capture the complexity of real life in a verbal formulation. That does not, however, render the statute itself unconstitutionally vague.

12

## III.

### ANY ERROR IN ADMITTING PRIOR-ACTS EVIDENCE WAS HARMLESS

Gonzalez contends the evidence of Gonzalez's encounters with two women prior to the attempted rape invited the jury to draw an impermissible inference of criminal propensity in violation of Evidence Code section 1101, subdivision (a), and that the limiting instruction was insufficient to dispel this prejudice. He cites cases cautioning against the "inflammatory" nature of sexual-misconduct evidence, particularly when the prior conduct is similar to the charged offense.

Assuming, without deciding, that the court committed error in admitting the evidence, we conclude the error was harmless. The principal harm Evidence Code section 1101 seeks to prevent is an inference of guilt based solely on a defendant's character or disposition. Here, Gonzalez admitted to nearly all of the conduct underlying the charged offenses, and the defense's case contested only whether the movement satisfied the asportation element of aggravated kidnapping. The prior-acts evidence did not bear on that discrete issue in a way that could have affected the verdict.

Moreover, the jury was instructed under CALCRIM No. 375 that it could not consider the evidence for propensity, but only for the limited purposes identified. We presume jurors follow such instructions. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 821.) Given Doe's testimony, the corroborating physical evidence, Gonzalez's admissions, and the video surveillance, there is no reasonable probability of a more favorable verdict had the prior-acts evidence been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Even under the more stringent *Chapman* standard urged by Gonzalez, any assumed error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

## DISPOSITION

The judgment is affirmed.


                                    SANCHEZ, J.

WE CONCUR:


MOORE, ACTING P. J.


SCOTT, J.