# SUPREME COURT OF THE UNITED STATES

## INDIANA, EX REL. DANNY W. HOWELL *v.* CIRCUIT COURT OF INDIANA, WELLS COUNTY, ET AL.

ON PETITION FOR WRIT OF CERTIORARI AND MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS TO THE SUPREME COURT OF INDIANA

No. 25–5557.　Decided January 20, 2026

The motion of petitioner for leave to proceed *in forma pauperis* is denied, and the petition for a writ of certiorari is dismissed. See Rule 39.8. As the petitioner has repeatedly abused this Court's process, the Clerk is directed not to accept any further petitions in noncriminal matters from petitioner unless the docketing fee required by Rule 38(a) is paid and the petition is submitted in compliance with Rule 33.1. See *Martin* v. *District of Columbia Court of Appeals*, 506 U. S. 1 (1992) (*per curiam*).

JUSTICE JACKSON, dissenting from denial of motion for leave to proceed *in forma pauperis*.

To file a petition in this Court, litigants must pay a $300 fee, along with the (much higher) cost of printing 40 bound copies of their filing. Litigants who cannot afford the filing fee and the cost of printing can request to proceed *in forma pauperis*. The Court largely grants these requests, allowing those litigants to file for free, but our openness to indigent litigants has its limits. In fact, the Court sometimes imposes blanket filing bars that prohibit litigants from filing any more *in forma pauperis* petitions in noncriminal matters going forward, regardless of the merits of their claims.

Today, the Court bars essentially all future filings from Danny Howell (an indigent inmate serving a 70-year sentence) because Howell previously submitted a handful of pe-

titions we deemed "frivolous."[1]  Even if Howell were to iden-
tify meritorious grounds for habeas relief or wanted to bring
a justifiable challenge to his conditions of confinement, he
will now be prevented from doing so unless he pays the fil-
ing fee—no matter what.  A categorical, forward-looking fil-
ing bar is a questionable restriction as to any litigant who
cannot afford to pay a filing fee.  For me, it is an intolerable
one as to incarcerated individuals.  Accordingly, I respect-
fully dissent.

# I

The Court began imposing prospective filing bars on *in
forma pauperis* litigants in 1989.  First was Jessie McDon-
ald.  The Court's decision to bar McDonald made intuitive
sense: He had filed 73 petitions over the preceding 18 years,
several of which were collateral attacks on a state convic-
tion for which he was no longer incarcerated.  *In re McDon-
ald*, 489 U. S. 180, 183 (*per curiam*).  Over the dissent of
four Justices, the Court barred McDonald from proceeding
*in forma pauperis* when seeking extraordinary writs in the
future.[2]

Less than two years later, over the dissent of three Jus-
tices, the Court imposed another filing bar, this time pre-
venting Michael Sindram from proceeding *in forma*

---

[1] See this Court's Rule 39.8 ("If satisfied that a petition for a writ of
certiorari, jurisdictional statement, or petition for an extraordinary writ
is frivolous or malicious, the Court may deny leave to proceed *in forma
pauperis*").

[2] We emphasized that extraordinary writs are "'drastic and extraordi-
nary remedies,' to be 'reserved for really extraordinary causes.'"  *In re
McDonald*, 489 U. S., at 185 (quoting *Ex parte Fahey*, 332 U. S. 258, 259–
260 (1947)).  We further noted that the Court had "not granted the sort
of extraordinary writ relentlessly sought by [McDonald] to any litigant—
paid or *in forma pauperis*—for at least a decade."  489 U. S., at 184.  The
nature of extraordinary writs not only made McDonald's repeated filings
frivolous, but it also meant that the filing bar—which targeted only fu-
ture requests for that particular form of relief—did not significantly bur-
den McDonald's access to the Court.

*pauperis* when seeking extraordinary writs in the future. Sindram had filed 43 separate petitions over the prior three years, the majority of which related to a speeding ticket he had received years earlier. *In re Sindram*, 498 U. S. 177, 177–178 (1991) (*per curiam*).

The following year, the Court significantly expanded the reach of its filing bar. Over the course of a decade, petitioner James Martin had filed 54 *in forma pauperis* petitions requesting writs of certiorari in connection with a variety of civil disputes. With two Justices dissenting, the Court barred Martin from filing any future petitions for certiorari in noncriminal cases; unlike *McDonald* and *Sindram*, this bar was not limited to requests for extraordinary writs. *Martin* v. *District of Columbia Court of Appeals*, 506 U. S. 1, 2–3 (1992) (*per curiam*). Martin's circumstances lent this Court a useful shorthand: When we bar indigent litigants from filing any future *in forma pauperis* petitions, we now say that we are "*Martin*izing" them.

The Court's exasperation with McDonald, Sindram, and Martin was understandable. Each of those litigants had flooded the Court with dozens of frivolous filings, causing significant administrative burdens. In the Court's view, a prospective filing bar was necessary to "curb serious abuses" of its docket and to ensure that the Court could allocate its resources "in a way that promotes the interests of justice." *McDonald*, 489 U. S., at 184.

Even so, its decision to permanently restrict an indigent litigant's access to this Court was hotly contested. The dissenters in *McDonald* worried that, in the Court's "fervor [to] ensur[e] that rights granted to the poor are not abused," it had "embark[ed] on [an] unprecedented and dangerous course." *Id.*, at 185–187 (Brennan, J., dissenting). Similarly, to the dissenters in *Sindram*, even though prolific litigants do cause a "minimal annoyance," preserving their access was "well worth the cost" given the Court's "longstanding tradition of leaving [its] door open to all

classes of litigants." 498 U. S., at 182 (Marshall, J., dissenting). The dissenters feared that *in forma pauperis* filing bars abandoned that "proud and decent" tradition. *Ibid.* They also predicted that what started as a rare step would turn out to be "merely the prelude" to a more habitual shutting of the courthouse doors. *McDonald*, 489 U. S., at 187 (Brennan, J., dissenting).

## II

The dissenters were right. The Court has steadily expanded the reach of *Martin*, transforming what was once an extraordinary measure into a routine order.

Howell's case is a prime example. He has filed only six petitions over the span of 14 years—hardly a flood. Before this one, Howell's last petition was in 2018, eight years ago. Moreover, quite unlike McDonald, Sindram, or Martin, Howell is in state custody and serving a long prison sentence; all six of his petitions have raised claims challenging aspects of his conviction.

Howell's case is not an outlier. By my count, the Court has now invoked *Martin* hundreds of times to prospectively bar indigent litigants from filing *in forma pauperis*. We no longer wait for a petitioner to inundate the Court with frivolous filings. Instead, we reflexively *Martin*ize petitioners after only a few petitions. See, *e.g.*, *In re Nelson*, 607 U. S. ___ (2025) (*Martin*ized after five petitions); *Navarro Martin* v. *Florida*, 607 U. S. ___ (2025) (*Martin*ized after six petitions).

Even more troubling, though the Court did not have occasion to consider in *McDonald*, *Sindram*, or *Martin* whether filing bars were necessary or appropriate for incarcerated litigants, we now routinely impose filing bars on prisoners. See, *e.g.*, *Crosby* v. *Starr*, 607 U. S. ___ (2025) (*Martin*ized after filing a petition for certiorari arising from habeas proceedings raising claims under the First Step Act); *Brunson* v. *Herring*, 604 U. S. ___ (2024) (*Martin*ized

after filing a petition for certiorari arising from habeas proceedings raising claims of actual innocence); *Kaetz* v. *United States*, 602 U. S. \_\_\_ (2024) (*Martin*ized after filing a petition for certiorari arising from proceedings under 28 U. S. C. §2255 raising ineffective-assistance-of-counsel claims). According to our Clerk's Office, more than half of the petitioners whose filings we have categorically rejected per *Martin* in the past 22 years were prisoners.

## III

Applying *Martin* routinely to bar the filings of indigent incarcerated petitioners goes too far. In my view, such a restriction foolishly trades a pound of values for an ounce of convenience. That is, the Court now blocks indigent incarcerated individuals from ever more accessing our courthouse, just to avoid a minor administrative burden.

To be clear: *Martin*ized petitioners are totally barred from ever filing *in forma pauperis* noncriminal petitions in the future—even to raise new claims based on favorable changes in the law (which sometimes happen), or to challenge the ongoing conditions of their confinement (which, in our society, prisoners are allowed to do). The future is famously hard to predict. So the justification for a permanent filing bar—even one related to the Court's administrative convenience—is murky at best.

Changes in the law can give rise to meritorious challenges that a prisoner might be able to raise by filing a civil habeas petition. Consider, for instance, the *pro se* petitioner in *Welch* v. *United States*, 578 U. S. 120 (2016), who filed an *in forma pauperis* petition raising a collateral challenge to his sentence in light of our prior decision in *Johnson* v. *United States*, 576 U. S. 591 (2015). Welch's filing ultimately resulted in the Court applying *Johnson* retroactively. 578 U. S., at 130. But if Welch had been *Martin*ized, he would have been unable to seek relief in this Court.

Similarly, the conditions of a prisoner's confinement may give rise to new constitutional claims. In *Wilkins* v. *Gaddy*, 559 U. S. 34 (2010) (*per curiam*), for example, we held that a *pro se* petitioner proceeding *in forma pauperis* had stated an Eighth Amendment claim based on an assault by prison officials. Had Wilkins been *Martin*ized, he would have been barred from obtaining the relief to which he was due under our Constitution. Unfortunately, poor conditions in prisons across the country continue to pose potential constitutional problems.[3] Indigent prisoners who are *Martin*ized are unable to come to this Court to challenge these unsafe conditions and vindicate their constitutional rights.

In short, because time moves on after a person is imprisoned and things happen, we simply do not and cannot know whether indigent prisoners who have filed multiple "frivolous" petitions in the past might have a meritorious claim in the future. When liberty, bodily integrity, or fundamental fairness is at stake, preventing such litigants from ever again accessing our review imperils our ability to provide equal justice for all.

Meanwhile, the administrative burden involved in reviewing repeated (even frivolous) petitions filed by prisoners is minimal. It is the rare incarcerated person who has the wherewithal to flood the Court with filings, at least in the way that Martin, Sindram, and McDonald had done. Practicalities ordinarily do not allow for this, since prisoners often lack regular access to paper, pens, envelopes, and stamps. *Pro se* prisoners also usually handwrite their filings—a time-intensive process. And, regardless, it is not

_____

[3] See, *e.g.*, Dept. of Justice, Investigation of Alabama's State Prisons for Men 5–6 (Apr. 2, 2019), https://www.justice.gov/crt/case-document/file/1149971/dl?inline= (detailing Alabama's failure to provide safe conditions for its prisoners); Dept. of Justice, Investigation of Georgia Prisons 3 (Oct. 1, 2024), https://www.justice.gov/d9/2024-09/findings_report_-_investigation_of_georgia_prisons.pdf (describing Georgia's failure to protect incarcerated people from violence).

difficult for Court staff to sort out *in forma pauperis* filings that raise new, potentially meritorious claims from repetitive, meritless petitions.

I believe that when balancing prisoners' access to judicial review, on the one hand, and reducing our administrative burden, on the other, we should err on the side of keeping our courthouse doors open. For a system designed to administer justice, reflexively rejecting (potentially meritorious) petitions from incarcerated litigants has a cost that is much too high when compared to the (meager) administrative efficiency gains. Nor should we forget the role that indigent incarcerated litigants have played in the development of important constitutional doctrines—and through habeas proceedings no less. See, *e.g., Gideon* v. *Wainwright*, 372 U. S. 335 (1963); see also *Sindram*, 498 U. S., at 181 (Marshall, J., dissenting).

Accordingly, I would not apply the filing bar that the Court imposes for frequent "frivolous" filers to prisoners who, like Howell, seek to proceed *in forma pauperis*.